[No. 30730. Department One. February 24, 1949.]

HERBERT F. HOKAMP, *Respondent*, v. ANNA STEWART HOKAMP, *Appellant*.[1]

*Rummens & Griffin* and *Kenneth P. Short*, for appellant.

*Shorett, Taylor & Revelle*, for respondent.

HILL, J.—The parties to this action were married in December, 1921. They have had no children. During the first ten years of their married life, the appellant continued her vocation as a teacher and, during a portion of that period, contributed more to the support of the family than did the respondent. In 1931, the respondent obtained employment with the Texas Company and, at the time of the trial, occupied a responsible position with it, receiving $489.92 a month "take home" pay. The parties had accumulated

[1]Reported in 203 P. (2d) 357.

property worth approximately forty-one thousand dollars and had liabilities of approximately eight thousand dollars. The principal item of value was a newly constructed home worth thirty thousand dollars (subject to a twenty-five hundred dollar mortgage).

The respondent asked for a divorce; the appellant, for separate maintenance. The trial court granted a divorce to the respondent and advised the appellant that she could also have a divorce if she would amend her pleadings to ask for it, which she declined to do.

The trial court ordered the house sold and made a fairly equal division of the property, and directed the respondent to pay to the appellant the sum of one hundred dollars a month until her remarriage or the further order of the court.

Appellant takes the position that respondent was not entitled to a divorce and that she was entitled to separate maintenance, and that, in any event, the court erred in the division of the property and in the allowance made for support money.

We are omitting any detailed marital history of the parties because we will agree, for the purposes of this opinion, with appellant's contention that the respondent's endearing letters to appellant should be taken as indicating that this was an idyllic marriage, and that the letters are not consistent with any finding of nagging and of a domineering attitude on her part. The last of these letters was written prior to August 29, 1946. Appellant also relies on a letter by respondent to his sister, dated August 9, 1946. It may be conceded, as appellant says, that "They refute every protestation he makes as to either cruelty, personal indignities or incompatibility."

It may also be conceded that respondent had had an affair with another woman, beginning in 1933 and continuing until 1937. It may be conceded that until August 29, 1946, appellant was a paragon of all the virtues, and that any slight rifts in their domestic felicity to that date had been solely and completely the fault of the respondent.

On August 29, 1946, appellant, angry because of respondent's insistence on having dinner with his sister, who was visiting in Seattle and whom he had not seen for twelve years, went to the home of Frederick C. Brooks, private secretary of the division manager of the Texas Company, and there made derogatory statements to Mr. Brooks and his mother about respondent's family, particularly his mother, including appellant's conclusion that respondent's mother had been "living in sin" with the man referred to in the record as respondent's stepfather. Appellant went to the Brooks' home for the express purpose of telling what she knew about respondent's family, and to acquaint his friends with " 'the breed of people from which . . . [he] sprang.' " If the statements concerning respondent's mother were false, they constituted calumny, and, if they were true, they were unnecessarily and maliciously made. In either event, they were designed and intended to lower her husband in the estimation of his friends and business associates.

Whether this incident be considered—as the trial court evidently regarded it—the proverbial last straw which broke the back of a camel already overloaded with nagging, domineering, and jealousy, or whether it be regarded as the serpent which disrupted the garden of Eden of domestic felicity which we have heretofore assumed, is entirely immaterial. It constituted cruelty and personal indignities which have never been forgiven or condoned. Since August 29, 1946, there have been no letters which might, to use again the words of appellant, "refute every protestation he makes as to either cruelty, personal indignities or incompatibility."

Appellant's actions on that date stand undenied; however, there is an attempted justification. We are told that "She was fighting for her man and trying to keep her home." It is pointed out that she had appealed to his superiors in the Texas Company in 1935 and secured their co-operation in breaking up an affair with another woman at that time, and that she was merely resorting to the same technique in 1946.

The difference between the situations is obvious. She went to respondent's superiors in 1935 with information about a situation in which they could and apparently did intervene. There was nothing in the world they could do about the history which appellant chose to relate in the Brooks' home on August 29th. Her purpose was not to seek aid, but to degrade her husband and to let his friends know, as she said to him, " 'the breed of people from which you sprang.' "

There is nothing in the record, nothing in appellant's brief, that can justify or excuse the venomous and malevolent disclosures of appellant to Mr. Brooks and his mother on August 29th (or, for that matter, similar statements made at a later date to E. C. Swanson). To paraphrase familiar lines, "Not all her Piety nor Wit shall lure it back to cancel half a Line."

It is true that shortly thereafter the respondent sought other feminine companionship; and the trial court's statement that "He has had one love affair and apparently he is on his way to another," may well be justified. His conduct subsequent to August 29, 1946, would warrant the granting of a divorce to the appellant, and that the trial court offered to do; but it does not alter, justify, or excuse the cruelty and personal indignities to which we have referred.

Appellant's reliance on *McMillan v. McMillan*, 113 Wash. 250, 193 Pac. 673, as being what she terms a "white cow" case, is not justified, and the doctrine of recrimination therein referred to is not here applicable. That doctrine is that a person seeking a divorce must be innocent of any substantial wrongdoing to the other party *of the same nature* as that of which complaint is made. In the case of *Huff v. Huff*, 178 Wash. 684, 35 P. (2d) 86, we have a "cow" much more nearly the color of the present one than in the *McMillan* case. This court might well have been describing the situation and the issues in the present case when it there said:

"This is a divorce action. The plaintiff sought a decree on the ground of personal indignities. The defendant re-

sisted the divorce, and filed a cross-complaint in which she asked for separate maintenance. At the conclusion of the trial, the court indicated that, if the defendant would recast her pleading and ask for a divorce, a decree would be awarded to each of the parties, but the defendant refused to comply with the suggestion. The court found that the parties had been guilty of personal indignities upon each other, and entered a decree for a divorce, as asked for in the plaintiff's complaint. The defendant appeals, and presents two questions: (a) that the respondent was not entitled to a divorce, and (b) that the division of the property made by the court was not just and equitable."

The trial court there found that each of the parties had been guilty of cruel treatment of the other, and that they had imposed personal indignities upon each other rendering their respective lives burdensome. This court said that "the finding of the court is supported by the preponderance" of the evidence, and then added:

"It is said, however, that, since the court found that the respondent was at fault as well as the appellant, no divorce decree should have been granted. In this connection, it may be said that the rule that a party cannot be given a divorce when it is found that he has been guilty of like misconduct against the other party, is not here applicable. *McMillan v. McMillan*, 113 Wash. 250, 193 Pac. 673."

We then pointed out that the cruelties and personal indignities of which the parties were guilty were not of like nature.

It is apparent that, conceding whatever derelictions the appellant may urge against the respondent, they were not of the same nature as her efforts to humiliate and degrade him by her attacks on his mother's reputation and character.

The trial court was entirely justified in its conclusion that the respondent was entitled to a decree of divorce, if based on nothing except appellant's disclosures to Mr. Brooks and his mother (to say nothing of subsequent and similar outpourings to Mr. Swanson). We do not thereby mean to imply that there was not sufficient evidence to sustain the trial court's finding that appellant had been "extremely and unreasonably domineering and possessive"

toward respondent and had "constantly nagged and found fault with him." However, by adopting appellant's theory of the case down to the undisputed events of August 29, 1946, we obviate setting forth in this opinion a detailed analysis of the evidence covering the preceding twenty-five years.

Appellant also complains about the division of the property, her principal complaint being that the newly constructed home of the parties and the furnishings therein were not awarded to her and the respondent compelled to maintain her therein. This home was valued at thirty thousand dollars and the furniture at twenty-five hundred dollars. The value of all their property at the time of the trial was $41,863.96, and there were liabilities of $8,207.93, leaving a net of $33,656.03. Certainly no just and equitable division of the property of the parties, as required by Rem. Rev. Stat., § 989 [P.P.C. § 23-23], could have been made on the basis suggested by appellant. The house has sixteen thousand five hundred square feet of floor space on the main floor, including two large bedrooms, with additional bedroom space in the attic; there is a full basement, with a two-car garage. The cost of maintaining such an establishment for appellant's occupancy would be a burden which should not be placed upon the respondent. The able trial judge was eminently correct in his conclusion that the property should be sold.

The appellant was given twelve thousand five hundred dollars from the proceeds of the sale, the furniture, certain cemetery lots, and her personal effects. The award to her totaled $15,375 in value. The respondent's net share of the property on that basis would be $18,281.03; however, from that he was directed to pay appellant's attorneys' fees in the sum of six hundred dollars and all the costs of the sale of the home, including "Real estate commission, title insurance, stamp taxes, real and personal taxes." If the property sold for less than thirty thousand dollars, the loss fell upon him; if it sold for more than that, the parties were to share equally in the excess.

We are of the view that the division of the property was fair and equitable under all of the circumstances, particularly when it is considered that some eight thousand dollars of the amount awarded to respondent was tied up in insurance policies and a pension fund. We certainly cannot say that there was any abuse of discretion by the trial court in the division made of the property and in the provision made for appellant's support and maintenance.

The interlocutory decree appealed from is affirmed.

JEFFERS, C. J., BEALS, STEINERT, and MALLERY, JJ., concur.