[No. 30551.  Department Two.  May 6, 1949.]

HAZEL SHAY, *Respondent*, v. CHARLES SHAY, *Appellant*.[1]

*Irving D. Smith*, for appellant.

*Monheimer, Schermer & Mifflin*, for respondent.

ROBINSON, J.—This is an appeal from an interlocutory decree of divorce entered in an action brought by a wife who had previously brought, and afterwards dismissed, a similar action. Mr. Shay had also previously brought, and dismissed, a divorce action against his wife. This action was instituted in November, 1946.

The Shays were married in Seattle in 1940. No children were born as the result of the marriage. The case, therefore, presents no custody problems. Although the appellant assigns ten errors, his principal objections to the decree entered by the trial court may be summarized as follows:  (1) The court erred in granting the divorce to the respondent wife instead of to him; and (2) the court erred in ordering the real property of the parties sold and the proceeds, after payment of some community debts, divided between the parties, instead of awarding it to him, subject to the community debts, and requiring him to pay an equitable sum to the respondent in monthly installments.

[1] Reported in 205 P. (2d) 901.

The first of these objections invites a detailed analysis of the long factual record. We cannot imagine how a digest of the evidence would be of any use or value to anyone, and we will not undertake to repeat, in this opinion, the somewhat sordid tale for publication in our reports. It is the usual story of failure to get along together for various reasons. It has one somewhat unusual feature. One of the exhibits in the case is a very wicked-looking automatic pistol. The respondent testified that her husband always kept such a pistol about the house as a threat, and to frighten her. Appellant testified that this was not true, but that he kept it to "shoot fish." The trial judge was somewhat skeptical as to that, and we are also, although we have heard the expression, "as easy as shooting fish." It is our opinion that the evidence would have warranted the trial judge in granting a divorce to either party, or to both; but we conclude, from a study of the record, that he was amply justified in granting the divorce to the plaintiff wife.

The property settlement raises the difficult questions in this cause. At the time the Shays came to Seattle, they had no property other than their clothing and personal effects, excepting Mr. Shay's Oldsmobile and Mrs. Shay's trailer. Soon after their arrival, they sold the trailer and used the proceeds for community purposes. They both went to work. Mrs. Shay was a stenographer, and had a United States government civil service rating. Her husband was a lather. He affiliated with the appropriate labor union and worked as sent out from the union hall. He had an average earning of nearly three hundred dollars per month, except during the winter months when he averaged about two hundred dollars. His take-home pay for 1946 amounted to $3,147.29. Her earnings for the same period were $2,293.34. They did not pool their earnings. Each of them paid a considerable amount of the household bills, but there was a great deal of bickering about such matters.

As has been hitherto stated, Mrs. Shay sold her trailer soon after their arrival in Seattle. Mr. Shay kept his Oldsmobile, and still had it at the time of the trial. He mortgaged

it from time to time, and, at the time of trial, there was still a mortgage indebtedness with respect to it of two hundred sixty dollars. Not long after the couple arrived in Washington Shay bought a tract of land on the Tacoma-Seattle highway, about half way between the two cities. It had a frontage on the highway of about one hundred twenty-two feet, and ran back about six hundred feet. He purchased the required materials and constructed a building near the highway, which was more of a business structure than a dwelling house, but had living rooms attached. He also built quite a large chicken house on the rear end of the tract and erected a brooder house midway between the other two buildings. It seems that he secured a considerable part of the money required to procure the lumber and other materials for the buildings by the automobile mortgages hereinbefore mentioned. Each of the parties called two real-estate dealers to testify as to the value of the highway property. The trial judge said, in his oral opinion: "Twelve thousand dollars is what I consider the land is worth under the testimony." At the time of the trial, that property was subject to a mortgage upon which $4,055 remained unpaid.

In dividing the property, it was proper for the court to consider the physical condition of the parties. Dr. Minkove, a qualified physician, examined Mrs. Shay about a month before the trial and testified, in part, as follows:

"Q. Do you recall the day you saw her? A. I think it was August 25th, this year. Q. What were your findings at that time? A. The examination was negative except for cardio-vascular trouble, and I might say from the history that I got before she had this trouble before, and about two years ago she said she had similar heart complaint. Her chief complaint was pain and that was aggravated by her pre-cardial pain at the side of the chest where the heart is located. She had dizziness. And on examination of her heart she has cardio-vascular trouble. Her blood pressure was elevated. The systolic is 175 and the dystolic is 100, and both of those are a lot above normal. Q. From that examination did you come to any conclusion? A. My conclusion is without doubt she has hypertropic cardio-vascular disease, and I advised

Mrs. Shay that should be taken care of. She should avoid any unnecessary exertion to aggravate it, and to watch her diet. . . .

"CROSS EXAMINATION

"BY MR. SMITH: Q. What is the common name for it in English? A. No, there isn't any. It is hypertropic cardio-vascular disease. Q. Common in people of her age? A. Very common. Q. One of the things she can do is ordinary house-work? A. Yes, sir, I think so. Q. And ordinary office work? A. I think so. The pressure here is 175 over 100, and is con-sidered quite high, and although we know of them going much higher, there is danger of a cardial hemorrhage, and the idea is to always let them know. I must advise the patient as to what she needs which is rest. Q. Don't they go about with 220 or something? A. I had one patient I treated with 260, but a good rate is 100. Q. From 125 to 130? A. Let us talk of the insurance companies, and I will qualify as being the examiner for three or four life insurance com-panies. With the insurance companies if the systolic blood gets over 140 to 142, they will not insure an individual and if the dystolic pressure is over 99, and she had 125 at the time I examined her."

On the theory that Mrs. Shay was unable to carry on a gainful occupation, her counsel insisted that appellant be ordered to pay her seventy-five dollars per month as support money for a period of six months after the entry of the decree. In addition to this, the respondent was asking that the appellant be required to pay her attorneys' fees, and also a sum of one hundred five dollars which she had borrowed from her attorney in order to secure food and lodging during the pendency of the trial.

The trial judge was faced with a very difficult problem. According to his findings, the total value of the property of the parties was fourteen thousand eight hundred dollars. Against this were certain encumbrances and community debts which both the parties and their counsel agreed must be paid out of the property, amounting to $5,610.

The court also found that the appellant here, between October, 1946, and the time of the trial, had, from his own earnings, made payments upon the home mortgage, and upon the household furniture, and upon the automobile

mortgage, and upon a personal loan which the appellant had secured from a bank. The total amount of these payments was $1,951.

The plaintiff had prayed in her complaint that the community property be sold and the proceeds be divided between the parties. The appellant vigorously fought this idea throughout the trial, as he greatly desired to keep the Tacoma-Seattle highway property for his home. The trial court heard the views of counsel on the matter, and also those of the two litigants. When the trial judge outlined his views as to the property division at the beginning of the rendition of an oral opinion, he and counsel attempted to work out a plan by which the appellant might keep possession of the property by selling his automobile or again mortgaging it, or by refinancing the mortgage on the real estate. When the appellant first learned that the court was inclined to order the property sold and divide the proceeds, he abruptly left the courtroom. After the trial judge and both counsel had for some time discussed a plan by which the appellant might be awarded the highway property, appellant's counsel left, found him, and told him how the matter stood. When appellant returned with his counsel and the plan was even more fully explained to him, he flatly rejected it and was very unco-operative.

In due course, the trial judge entered detailed findings of fact and conclusions of law, and finally an interlocutory decree of divorce, from which the appellant perfected this appeal. Its principal provisions may be outlined as follows:

It is first ordered, adjudged, and decreed that the plaintiff be granted an interlocutory decree of divorce; and second, that the cross-complaint of the defendant for a divorce be denied. It is further adjudged and decreed that defendant pay the plaintiff as support money seventy-five dollars per month for a period of six months from the date of the decree. It is further decreed that the defendant pay the plaintiff's attorney the sum of three hundred dollars as attorneys' fees, and the costs and disbursements taxed. In the next paragraph the plaintiff is awarded the household furniture.

It is next ordered that the defendant be awarded the automobile. The remainder of the decree is concerned with the Tacoma-Seattle highway property, which the court valued at the sum of twelve thousand dollars, subject to the mortgage encumbrance in the sum of $4,055. It is ordered that this property shall be sold for the highest practical price, with the provision, however, that any proposed sale shall not be completed until approved by the court. It is further ordered that, from the proceeds of the sale, after payments therefrom of any income tax due to the United States government for profit made by the sale, commission for procuring the sale, indebtedness in the sum of two hundred sixty dollars to the Gevurtz Furniture Company, indebtedness in the sum of two hundred dollars to Louis Shela, and indebtedness in the sum of three hundred ninety dollars to the mother of the defendant, there shall be paid to the plaintiff as her sole and separate property one-half of the remainder thereof, and that the balance shall become the sole and separate property of the defendant, provided, however, that from Shay's share there shall be paid, at the time of the distribution of these funds, the sum of one hundred five dollars to Monheimer, Schermer & Mifflin for funds advanced to the plaintiff; three hundred dollars to Monheimer, Schermer & Mifflin, as plaintiff's attorneys' fees, and costs and disbursements taxed in her favor in the case.

It is further provided that the sale shall be made within ninety days from the date of the decree, provided, however, that, if the defendant desires to keep the real property as his sole and separate property, he may do so if, within this ninety-day period, he pays to the plaintiff a sum equal to one-half of the net equity of the parties in the real estate, based on a valuation of twelve thousand dollars; it being understood, however, that such payment to the plaintiff shall be computed after payment of the various bills and obligations set forth in the decree, and shall include payment by the defendant of these bills and obligations which, by the decree, the defendant is required to pay from his share of the real property; and it is further decreed that each of the

bills and obligations set forth, together with the sum of three hundred dollars, attorneys' fees to Monheimer, Schermer & Mifflin, "be and the same are hereby expressly declared to be a lien on the real premises until paid and discharged."

In view of the many complications with which the trial judge was faced, we think he entered a just and equitable decree. We appreciate, as the trial judge did, the normal desire of the appellant to retain the property which he improved with his own hard labor; and we note that, despite his offensive attitude when the court and counsel were attempting to formulate a plan by which the appellant could retain that property, the court, in entering the decree, gave him a ninety-day opportunity to work out a plan by which he could remain the owner thereof.

The decree appealed from will be affirmed in its entirety. It is so ordered.

SIMPSON, MALLERY, SCHWELLENBACH, and HILL, JJ., concur.