[No. 28848-2-I.    Division One.    April 26, 1993.]

*In the Matter of the Marriage of* MARCIA SEDLOCK, *Appellant, and* THOMAS SEDLOCK, *Respondent.*

*H. Michael Fields* and *Anderson & Fields,* for appellant.

*William L. Kinzel* and *Kinzel, Allen & Skone Inc. P.S.; Malcolm L. Edwards* and *Edwards, Sieh, Wiggins & Hathaway, P.S.,* for respondent.

KENNEDY, J. — Appellant Marcia Sedlock appeals the trial court's characterization, apportionment and distribution of certain assets in the dissolution of the parties' marriage.[1] We affirm in part, reverse in part and remand for further proceedings.

The facts as to each disputed item of property will be set forth as we discuss the issues and applicable law related thereto.

## I

### VALUATION OF PROFESSIONAL ASSETS

Thomas Sedlock is a certified public accountant who became a principal in the Clark Nuber accounting firm 2 years prior to this marriage. When the parties married, Thomas, then age 34, was earning $60,000 a year. By the time of trial

---

[1]The parties were married on June 10, 1983, and separated on July 15, 1989. There are no children of this marriage. Thomas filed for dissolution of marriage on March 14, 1990. Following a 6-day trial in March 1991, and motions for reconsideration by both parties, the court entered findings of fact, conclusions of law and the decree of dissolution of marriage on June 27, 1991.

his annual gross income was approximately $200,000. He owned 11 percent of the stock in the firm. His rights in the firm were governed by four documents: (1) a stock purchase and transfer restriction agreement; (2) a shareholder employment agreement; (3) "Deferred Compensation Agreement No. 1" (hereinafter Plan 1); and (4) "Deferred Compensation Agreement No. 2" (hereinafter Plan 2).

The amount to be paid for Thomas' stock and for his share of the accounts receivable and work in process at the time of his eventual termination or retirement is governed by the stock purchase and transfer restriction agreement and by Plan 1. Under the stock purchase agreement Thomas will receive the book value of his stock without considering the amount of his share of the accounts receivable or work in process. The book value of the stock will be paid at the rate of $4,000 a month at 12 percent interest. Under Plan 1, Thomas will receive his percentage shareholder interest in the accounts receivable and work in process, less expenses attributable thereto, also at the rate of $4,000 per month at 12 percent interest to commence immediately following the payoff for the book value of the stock.

Plan 2 provides for payments to certain key shareholders, including Thomas, of a portion of their respective salaries for 10 years following retirement. Plan 2 is subject to a vesting schedule. Thomas was 5 percent vested in Plan 2 at the time of marriage. As of December 31, 1989, the valuation date selected by the husband's expert witness for purposes of the divorce proceeding, Thomas was 41.25 percent vested in Plan 2. Thomas will become 100 percent vested in this plan 20 years from the date he became a principal in the firm. Although Plan 2 is to be phased out for most of the shareholders as a 401-K tax qualified retirement plan is phased in, Thomas and three other shareholders will remain beneficiaries of Plan 2 because of their special services to the firm and to its predecessor partnership.

All of these contracts were in place at the time of the marriage.

Marcia retained the services of Arthur Brueggeman and Thomas retained the services of Joseph Lawrence to value Thomas' business interests. Both experts testified that Plan 2 is an agreement to pay for professional goodwill and that the value of Plan 2 was subsumed in their respective calculations of professional goodwill. Although the experts disagreed as to the value of Thomas' professional goodwill, each believed that the goodwill was considerably more valuable than represented by Plan 2 alone.

Joseph Lawrence treated Plan 1 as subsumed in Thomas' professional goodwill, as well. He testified that, because Thomas expects to remain employed with the firm until normal retirement age, Plan 1 should be reduced to its present value for purposes of the valuations here at issue. Mr. Lawrence valued Thomas' business interests as of December 31, 1989, as follows:

| | |
|---|---|
| Book value of stock | $28,959 |
| Plan 1 | (subsumed in goodwill)[2] |
| Plan 2 | (subsumed in goodwill) |
| Goodwill | 100,000 |
| Total | $128,959 |

Arthur Brueggeman treated Plan 1 as part of Thomas' investment into the net tangible assets of the company (a present value investment) and therefore opined that no reduction to present value was appropriate. Mr. Brueggeman valued the business assets as of December 31, 1990 — a year later than the date selected by Joseph Lawrence. On that date Plan 1 was worth $102,000. If Thomas had cashed out on that day he would have received $102,000 payable at

---

[2] As of December 31, 1989, Thomas' interest in Plan 1 was $136,000. Had he retired or otherwise terminated his employment on that date, he would have received $136,000 payable in monthly installments. However, since he did not plan to retire or otherwise terminate until his normal retirement age, Mr. Lawrence testified that the present value of Plan 1 was only $23,163. We note that the "deferred compensation" covered by Plan 1 was acquired entirely during marriage. However, a portion thereof may be attributable to a return upon Thomas' separate investment as opposed to being purely compensation for Thomas' labor. These issues need to be further explored and determined following our remand.

the rate of $4,000 a month at 12 percent interest. Bruegge-man testified that the fact that Thomas did not "sell" Plan 1 as of December 31, 1990, does not mean that Plan 1 was not worth $102,000 as of that date.

Mr. Brueggeman testified that, as of December 31, 1990, Thomas' business assets were valued as follows:

| | |
|---|---|
| Book value of stock | $39,000 |
| Plan 1 | 102,000 |
| Plan 2 | (subsumed in goodwill) |
| Goodwill | 160,000 |
| Total | $301,000 |

At trial, Thomas presented a calculation reducing Plans 1 and 2 to present value, prepared in-house by his firm, not for the divorce proceedings but at the request of the firm's bankers. According to this calculation the combined present values of Plans 1 and 2 was $51,857.

Following trial, and as the result of a motion for reconsideration by Marcia, the trial court issued a memorandum decision in which it adopted Mr. Brueggeman's figures. Then, Thomas filed a motion for reconsideration, suggesting that the evidence at trial would support the following "compromise" ruling:

| | |
|---|---|
| Book value of stock | $39,000 |
| Plans 1 and 2, reduced to present value | 51,582[3] |
| Goodwill | 118,804[4] |
| Total | $209,386 |

The trial court issued a memorandum decision on the same day that Thomas filed his motion, adopting this "compromise" approach.[5]

---

[3]The $51,582 figure was derived from Clark Nuber's in-house calculations aforementioned. Marcia challenges this figure.

[4]The $118,804 figure was based on certain adjustments to income and capitalization rates, substituting some of Joseph Lawrence's figures for those of Arthur Brueggeman. Marcia does not challenge this figure.

[5]Marcia also argues that the trial court erred by adopting the husband's "compromise" figures on the same day Thomas filed his motion for reconsidera-

Marcia argues that Arthur Brueggeman's approach to the valuation of Plan 1 is legally correct and should be given the force of law in this state. She also contends that Plan 1 should be treated as if it were a pension plan and, since Thomas has the power to determine when he will avail himself of the benefit, the trial court should have valued the plan as of the earliest opportunity the benefits could be obtained. *See In re Marriage of Gillmore*, 29 Cal. 3d 418, 426, 629 P.2d 1, 174 Cal. Rptr. 493 (1981) and *In re Marriage of Hurd*, 69 Wn. App. 38, 45-46, 848 P.2d 185 (1993) (because employee spouse could retire at any time and had an unconditional right to immediate payment of his pension upon retirement, pension was both vested and matured; pension should be valued as of date of dissolution rather than at some future date when employee spouse might choose to retire).

Thomas responds that the trial court's valuation findings are within the range of the credible evidence, and that is all that is required. *See Worthington v. Worthington*, 73 Wn.2d 759, 764-65, 440 P.2d 478 (1968). We agree with Thomas.

Certainly there are some logical inconsistencies in the trial court's "hybrid" approach to these valuation issues which would likely shock *both* expert witnesses. Although Plan 2 shares many attributes of a retirement plan and relates to funds which will not be received for many years, Plan 1 relates instead to Thomas' share of the firm's accounts receivable and work in process. Thomas will receive an ongoing return from these Plan 1 assets in the form of salary, bonus and contributions to his 401-K plan, month by month and year by year during the remainder of his employment. Although it is likely that the firm will set aside cash reserves

---

tion and before Marcia had any time to respond. In fact, the trial court did this. However, the wife's position on all of these issues was well known to the court, based on Marcia's earlier motion for reconsideration, and the court's formal, written findings and conclusions were not entered until nearly a month later, following a contested presentation hearing. Marcia submitted a memorandum reiterating her earlier position and arguing against the "compromise" figures, prior to the presentation hearing. Under these circumstances we find no error based on the timing of the court's grant of Thomas' motion for reconsideration.

from which to honor its Plan 1 and Plan 2 contractual obligations to its retiring shareholders, the value of Thomas' share of the accounts receivable and work in process as of the date of trial bears little if any relationship to these cash reserves.

The factfinder is given wide latitude in the weight to give expert opinion. *Taylor v. Balch Land Dev. Corp.*, 6 Wn. App. 626, 632, 495 P.2d 1047 (1972). If the trial court had wholly adopted the approach of *either* Mr. Brueggeman or Mr. Lawrence, this court would be constrained to affirm. Both are wholly credible experts. As their respective testimony indicates, reasonable minds can differ regarding the approach to business valuation issues. Where, as here, a trial court determines that the true value of an asset may lie somewhere between the values testified to by "expert A" and "expert B", the trial court may adopt a "compromise" figure.

> Where, as here, the value placed upon the property was greater than that given by one witness and less than that presented by another witness, the court had substantial evidence to support its findings.

*In re Marriage of Soriano*, 31 Wn. App. 432, 435, 643 P.2d 450 (1982). If the trial court had simply adopted the same bottom line "compromise" value for the business assets here at issue, without explaining its reasoning, we would likewise be constrained to affirm. That the trial court did explain, and that we may disagree with its reasoning, does not change the result. To rule otherwise would be to place the appellate courts in the position of *weighing* expert testimony, a position we decline to take.

Instead, we look to the reasonableness of the trial court's bottom line result, in light of all of the expert testimony. Here, Joseph Lawrence testified that he believed the combined value of Plans 1 and 2 and the professional goodwill was $100,000. Mr. Brueggeman testified that he believed that the combined value of Plans 1 and 2 and the professional goodwill was $262,000. By the trial court's approach, unorthodox as it may be, the combined value of Plans 1 and 2 and the professional goodwill is $169,582 — $69,582 higher than the Lawrence figure and $92,418 lower than the Brueg-

geman figure.[6] The trial court's finding is within the range of the credible evidence. Accordingly, we affirm the trial court's findings as to valuation of these business assets.

## II
### APPORTIONMENT OF PROFESSIONAL ASSETS

The trial court found that the marital community owned 20 percent of Plans 1 and 2 and 20 percent of Thomas' professional goodwill and that the remainder of these assets were Thomas' separate property.[7] Marcia argues that there is not substantial evidence to support this finding. Although not cross-appealing, Thomas argues that 100 percent of Plan 1 is his separate property in any event. He argues that Plan 1 is merely a method of paying that portion of the value of his shares in Clark Nuber which is represented by the accounts receivable and work in process of the corporation.[8] Thus, he claims, the trial court's only error benefited Marcia.

As for the professional goodwill, Thomas argues that the trial court would have been justified if it had found all of the goodwill to be his separate property and that there is substantial evidence to support the trial court's allocation of 80 percent of the goodwill to his separate estate. We disagree.

At trial, Thomas testified that he had 8 years of education and 10 years of employment experience before this marriage. Although his ownership interest in Clark Nuber predates the marriage by only some 2 years, when Thomas left

---

[6]The trial court rounded the value of the professional goodwill downward to $118,000.

[7]Twenty percent of $51,582 is $10,316. Twenty percent of $118,000 is $23,600. Accordingly, Thomas' side of the community ledger was credited with the sum of $33,916. It is undisputed that the book value of the stock, found by the court to be worth $39,000, is entirely Thomas' separate property. Accordingly, Thomas' separate ledger was credited with the sum of $174,666 for his separate interest in the accounting firm.

[8]We note that this argument is not wholly consistent with the testimony of Joseph Lawrence, Thomas' expert witness at trial.

his previous (nonownership) position and came to Clark Nuber, he brought 78 clients with him, 15 of whom were still with the Clark Nuber firm as of the time of trial.

Thomas testified that the firm keeps a list of its "top 100" clients in terms of fees generated. Twenty of these top 100 clients were labeled as having been generated by Thomas, including the 15 which he acquired prior to this marriage. The top 100 clients generate 60 to 65 percent of the firm's gross annual revenues. Thomas testified that the 15 clients he acquired before marriage generate 82 percent of the total fees generated by "his" 20 of the top 100 clients.[9] Thomas also testified that the firm services 1,500 to 1,800 clients altogether and that he personally works for some 250 clients.

Marcia argues that virtually 100 percent of the professional goodwill is a community asset. She argues that, to the extent Thomas had any goodwill at all at the time of the marriage, it was de minimis, as reflected by the fact that he was only 5 percent vested in Plan 2 as of that date — the very plan adopted by the company in recognition of the contributions of several key employees to the professional goodwill of the firm as of the time it was incorporated. She points out that Thomas was earning only $60,000 at the time of the marriage. By the time of trial he was earning approximately $200,000, a figure that is almost entirely attributable, she asserts, to community labor. Marcia also points to the following testimony by Arthur Brueggeman, given in response to the question "When does . . . goodwill arise?"

> [MR. BRUEGGEMAN:] That's at once a very simple but extremely complex question. It's impossible to say, obviously, with any precision when this goodwill specifically arose.
>
> . . . Goodwill is . . . an intangible asset[.] [I]t's probably the most volatile, the most ephemeral asset in the hierarchy of assets. . . . Goodwill is something that has to be continu-

---

[9] These 15 clients generate about one-tenth of the annual gross revenues of the firm.

ally renewed, continually regenerated. It is a wasting asset in that regard.

. . . .

It's like a "what have you done for me lately?" sort of notion. Nobody in professional practice is resting on what [he or she] did ten years ago, five years ago, for that matter. It's a continual, relentless effort to nurture, grow or maintain a professional reputation . . . and the ability to attract and service clients.

Each side relies upon *In re Marriage of Brooks*, 51 Wn. App. 882, 756 P.2d 161, *review denied*, 111 Wn.2d 1021 (1988) as supportive of his and her respective positions with respect to the character of Thomas' goodwill. There, attorney Brooks became a partner in a law firm a year prior to marriage. He later left that firm and moved to another in which he also became a principal. Brooks invested the $15,000 he received for his interest in the previous firm into the new firm. Ten years later, the parties separated. Finding that there was no evidence that attorney Brooks had more than de minimis goodwill at the time of the marriage, in that he had been a partner for less than 2 years at that time, the *Brooks* court sustained the trial court's determination that 100 percent of Brooks' goodwill was acquired during marriage and, accordingly, was community property.[10] *Brooks*, 51 Wn. App. at 888-89. This being so, the trial court was not required to apportion goodwill.[11]

---

[10]Thomas points to footnote 6 on page 889 of *Brooks* wherein the court stated that the goodwill of a professional who was firmly established in practice at the time of marriage would remain separate property. Thomas claims this describes his situation exactly.

[11]In *Brooks*, the court cited *In re Marriage of Lopez*, 38 Cal. App. 3d 93, 113 Cal. Rptr. 58 (1974), noting that, in *Lopez*, the California court suggested several possible approaches to apportioning professional assets including goodwill, holding, however, that there is no fixed standard for such apportionment and that the courts should use such approach as will achieve substantial justice in an individual case. *See Brooks*, 51 Wn. App. at 888 n.5; *Lopez*, at 105-06.

In *In re Marriage of Fleege*, 91 Wn.2d 324, 588 P.2d 1136 (1979) our Supreme Court adopted the rationale of *Lopez* in formulating what we now refer to as the *Fleege* factors. We deem it likely that our Supreme Court would also be persuaded by the *Lopez* approach to apportionment.

Marcia argues that *Brooks* is supportive of Mr. Bruegge-
man's "wasting asset" theory. Thomas argues that it is not.[12]
■■ It is clear from our Supreme Court's decision in *In
re Marriage of Hall*, 103 Wn.2d 236, 692 P.2d 175 (1984)
that a salaried professional who has no ownership interest
in the entity which employs him or her can have no profes-
sional goodwill. Goodwill is not the same as earning capac-
ity. It is a distinct asset which supplements the earning
capacity of another asset — a business or a profession. *Hall*,
103 Wn.2d at 241-42. Accordingly, we hold that Thomas
acquired no professional goodwill before he acquired an
ownership interest in Clark Nuber.

Here, there is evidence that Thomas had acquired *some*
goodwill by the time of his marriage to Marcia, based on the
existence of Plan 2 and Thomas' 5 percent vesting therein.
The value of Thomas' goodwill as of the date of the marriage
was not a subject of expert testimony at trial.[13] By its very
nature, Plan 2 suggests that the accounting firm adheres to
something very much akin to Arthur Brueggeman's "wast-
ing asset" theory. To fully vest in Plan 2 requires 20 years
and goodwill is an asset which, although not the same as
earning capacity, is certainly an enhancement thereto. The
ultimate value of Plan 2 is closely related to Thomas' earn-
ing capacity as it may be measured in relation to his salary
at the time that he retires. Thus, the nurturing of goodwill is
seen by the firm as an ongoing process.

We have thoroughly reviewed the record of this trial and
have concluded that the trial court's apportionment of Tho-
mas' goodwill can have come from only one of two sources,

[12]Certainly, footnote 6 at page 889 of *Brooks* is not supportive of a "wasting
asset" theory. Nevertheless, the validity of Mr. Brueggeman's description of the
nature of professional goodwill will be apparent to virtually every attorney in
private practice today. We doubt that accountants, physicians and other pri-
vately practicing professionals would disagree. The validity of the dicta con-
tained in footnote 6 of *Brooks* is questionable.

[13]Nor did either expert opine as to the character of Plan 1, Plan 2 or the pro-
fessional goodwill or as to any formula which might be considered in terms of
apportionment.

neither of which can withstand appellate review: either the apportionment came out of thin air, or it was based upon Thomas' testimony that the 15 clients he acquired prior to marriage generate some 80 percent of the gross revenues generated by "his" 20 clients who are among the top 100 clients of the firm. These 15 clients generate approximately 10 percent of the gross revenues of the firm. But the firm services 1,500 to 1,800 clients and Thomas personally works for many more than these 15 "original" clients. Certainly the nurturing of these 15 clients and the expectation of their continued patronage is a significant part of Thomas' goodwill. It is not, however, indicative of 80 percent thereof.

A strict *Hall* and *Brooks* approach to this case would suggest that all or nearly all of Thomas' professional goodwill belongs to the marital community. Notwithstanding *Hall* and *Brooks*, however, when the firm incorporated before this marriage, Thomas was one of four principals given special recognition by the firm for their preincorporation contributions to goodwill and, no doubt, in the expectation of a continued high level of service over the ensuing 20 years. Although a contractual method of vesting in professional goodwill will be rare, and although Thomas' goodwill is greatly in excess of the value of Plan 2 as of the time of trial, certainly that vesting schedule suggests one possible approach to the apportionment of at least that portion of the goodwill in this case which is reflected in Plan 2.

On the other hand, the means used by both experts to calculate the value of Thomas' goodwill placed no weight on the vesting schedule. Rather, each expert included calculations by which the value of Thomas' tangible net assets and a reasonable rate of return thereon were deducted before a capitalization rate was applied to the remainder of his net average earnings to obtain an estimate of the value of his professional goodwill.[14] As recognized in *Brooks*, 51 Wn. App.

---

[14]Each expert witness testified as to his respective approach, considering the five major formulas for measuring goodwill set forth in *Hall*, 103 Wn.2d at 243-45.

at 889-90, in three of the five major formulas utilized to measure goodwill, the value of a business owner's investment and a reasonable rate of return thereon is first deducted. In this case, as was true in *Brooks*, those deducted items are separate property. From the point of view of the character of the assets being measured, these goodwill calculations, to the extent that they are calculated on the basis of average net earnings during marriage, would appear to be measuring community property. *See Brooks*, 51 Wn. App. at 890 nn.7, 8, 9.

We stop short of any determination of "the correct" approach to apportionment in this or any other case. The trial court will likely wish to hear additional testimony on this issue, because there was no substantial evidence at the first trial by which we can affirm the 80 percent/20 percent determination made in this case. To the extent that the trial court may wish to consider the *In re Marriage of Lopez*, 38 Cal. App. 3d 93, 113 Cal. Rptr. 58 (1974) approaches to apportionment, expert testimony would be of great assistance. We reverse and remand this apportionment issue for further proceedings, in light of this decision.

## III
### VALUATION OF THE FAMILY HOME

Marcia contends that the trial court's finding that the family home is worth $850,000 is not based upon substantial evidence. We disagree. This is a lakefront property. Two Member Appraisal Institute appraisers testified at trial. Stuart Clark, who was called by Marcia, testified that, in his opinion, the home was worth $750,000 at the time of trial. Clark relied upon "comparables" located 3 and 4 miles away. John Yerkes, who was called by Thomas, testified that, in his opinion, the home was worth $900,000. He placed substantial weight on a recent sale of the house next door. Marcia argues that the house next door is not truly comparable and that Yerkes' testimony is internally inconsistent. Based on the testimony of these two expert witnesses, a rational trier of fact could determine that the Sedlock

home, although not as "nice", in some respects, as the house next door, is worth $850,000 in that it enjoys a superior view to that of the house next door and it has a dock which extends into water deep enough to moor a sailboat (an advantage not had by the property next door). It is the province of the trial court, and not this court, to weigh the expert testimony. Once again, this is what Marcia requests that *we* do. We decline, based upon the same case law cited in section I of this decision. The trial court's valuation is well within the range of the expert testimony. Accordingly, we affirm the trial court's finding that the family home was worth $850,000 as of the time of trial.

## IV
### AWARD OF THE FAMILY HOME IN
### TENANCY IN COMMON

The trial court awarded the family home to the parties as tenants in common, three-fifths to Marcia and two-fifths to Thomas. The home was required to be placed on the market within a fixed time limit and sold for its fair market value. The home was the asset used by the court to accomplish an overall division of community assets of 55 percent to Marcia and 45 percent to Thomas.

Marcia asserts that the court erred in leaving the parties as tenants in common in relation to the family home. We disagree.

Marcia is correct that the court has a duty to dispose of all the property of the parties before it, *Shaffer v. Shaffer*, 43 Wn.2d 629, 630, 262 P.2d 763 (1953), and the parties have a right to have their property interests definitely and finally determined. *Bernier v. Bernier*, 44 Wn.2d 447, 449, 267 P.2d 1066 (1954).

In *Shaffer* the Washington Supreme Court found that the trial court failed to perform its statutory duty by awarding an apartment house to the divorcing couple as tenants in common with no direction that the apartment house be sold. *Shaffer*, at 630. The Supreme Court found the same error in

*Bernier* where the trial court awarded the family home to the divorcing couple as tenants in common with the wife having sole rights to occupancy until she remarried or their child grew up. *Bernier*, at 448-49. *See also* Washington State Bar Ass'n, *Community Property Deskbook* § 39.4 (1977) for the stated proposition that courts cannot award property to parties as tenants in common in marital dissolutions.

In *Bernier*, as in *Shaffer*, the vice of the award was that it did not finally fix the parties' interests in the home. Rather, the court left the parties to file an eventual partition action. In both cases the result was as if the property had not been divided at all, *i.e.*, as if it had never been brought before the court for disposition. That vice is avoided where the court, as here, fixed each party's fractional share and provided for the sale of the home within a fixed period of time.

Thomas cites to two cases where courts have found no harm in a short-term joint holding of the property with a definitive determination of the parties' rights upon sale of the residence. *See Murphy v. Murphy*, 44 Wn.2d 737, 744-45, 270 P.2d 808 (1954) and *Hokamp v. Hokamp*, 32 Wn.2d 593, 598, 203 P.2d 357 (1949). *Murphy* and *Hokamp* both affirm the lower courts' orders to sell the family home. However, neither directly addresses the issue of tenancy in common. *Murphy*, at 744-45; *Hokamp*, at 598.

The Supreme Court has recently expressed an unwillingness to broaden *Shaffer* beyond its facts. In *Byrne v. Ackerlund*, 108 Wn.2d 445, 739 P.2d 1138 (1987), the trial court awarded the husband the house and the wife a lien of $2,500 plus 50 percent of the net proceeds above a certain amount. The decree did not provide a definite time within which the lien would have to be paid. Rather, the lien was payable upon the transfer of the property, which was completely within the discretion of the husband. In refusing to apply *Shaffer* to reverse the trial court, the Supreme Court found that the parties were "not left in the same situation as if the trial court had simply failed to dispose of the property." *Byrne*, at 449. *See also Wells v. Wells*, 130 Wash. 578, 580-81, 228 P. 692

(1924); *Aiassa v. Aiassa*, 151 Wash. 468, 472, 276 P. 547 (1929) (in both cases the courts awarded property to parties as tenants in common because sale was imprudent at that time and partition was impractical).

The present case is distinguishable from *Shaffer* and *Bernier* and more analogous to *Byrne*, in that the parties were not "left in the same situation as if the trial court had simply failed to dispose of the property." In addition, unlike *Bernier* and *Shaffer*, here, the tenancy in common was intended to be of short duration and the parties' respective interests in the home were clearly established by the court. Therefore, based on the distinguishing circumstances in *Shaffer* and *Bernier* and the Supreme Court's reluctance to broaden *Shaffer* in *Byrne*, we hold that the trial court did not abuse its discretion or exceed its jurisdiction by leaving the parties as tenants in common for a short duration.

Moreover, the trial court recognized that adverse tax consequences would have resulted if the trial court had awarded the home to the wife with a lien to the husband for the same fractional share, with an order that the home be marketed and sold in order to satisfy his lien. If the trial court had chosen that route, the wife would have acquired the entire tax basis in the home and the entire obligation for the capital gains tax due on the sale. The husband's share of the gain would have been tax free to him. *See* I.R.C. § 1041.

The tenancy in common approach, with an order to sell within a short period of time and a ruling concerning the parties' fractional shares, avoids these untoward tax results without the problems found in *Bernier* and *Shaffer*. The trial court properly considered the adverse tax consequences to the wife which would result from a more "traditional" property award. We deem it highly unlikely that our Legislature intended to deprive the courts of jurisdiction to reach an equitable result in view of everchanging federal tax laws.

## V
### FORCED SALE OF THE HOME

Marcia also asserts that the court lacked jurisdiction to compel the sale of the family home. In the alternative, she

contends that, if the forced sale is subject to the court's discretion, there was an abuse of discretion, as no substantial evidence existed to support a forced sale. We disagree with both propositions.

The trial court concluded that it had jurisdiction to order a sale of the Sedlock residence pursuant to RCW 26.09.080 and a number of Washington Supreme Court cases: *Hokamp*, 32 Wn.2d at 598-99 (finding wife's desire to keep house and have husband maintain her in it was inequitable, affirms order to sell); *Murphy*, 44 Wn.2d at 744-45 (finding order to sell home was proper and parties' contentions that it was unmarketable were premature); *Shay v. Shay*, 33 Wn.2d 408, 205 P.2d 901 (1949) (affirming the trial court's order to uncooperative husband to sell property that he wanted to keep for his home or pay his wife her share in 90 days); *Rentel v. Rentel*, 39 Wn.2d 729, 734-35, 238 P.2d 389 (1951) (reversing the trial court's placing of a second house, not the family home, in trust for the minor children, and ordering that it be sold). Thomas also cites to *Byrne* as supportive of an order to sell. *Byrne*, at 456 (affirming award of real estate to husband with lien awarded to wife with right to payment when husband decided to sell).

Marcia contends that in none of the above cases was the trial court squarely confronted with whether it had the authority to order a sale of the couple's property absent the consent of the parties. She is correct on this point.

The issue in *Rentel* was whether the trust was manageable. The Supreme Court held that it was not and ordered the property sold. *Rentel*, at 735. *Byrne* addressed whether the trial court had made a sufficiently definitive division of the parties' assets. *Byrne*, at 446, 456. In *Shay* the husband retained the option of keeping the property and paying his wife. Therefore, he retained ultimate authority concerning whether to sell. *Shay*, at 413. The issue of the court's authority was not raised. In *Hokamp* and *Murphy* the issues were whether the courts' orders were equitable. *Hokamp*, at 598; *Murphy*, at 744-45. Again, whether the court had jurisdiction to order the sale was not raised.

Marcia asserts that the cases directly addressing whether the court has jurisdiction to order a sale of the couple's property, absent the couple's consent, have held that the court lacks jurisdiction. *See Arneson v. Arneson*, 38 Wn.2d 99, 103, 227 P.2d 1016 (1951) (finding that trial court lacked jurisdiction to order sale of family assets for benefit of creditors); *High v. High*, 41 Wn.2d 811, 822, 252 P.2d 272 (1953) (finding that the trial court lacked jurisdiction to order sale of couple's land which was bought for speculation).

As Thomas points out, *Arneson* is distinguishable because the trial court ordered a sale of the couple's assets *for the benefit of the creditors*. The reviewing court found that the order for the benefit of the creditors was improper in a marital dissolution.

*High* is also distinguishable. In *High* the couple had bought three separate tracts of land for speculation. The trial court ordered that "(a) the separate tracts of land be sold by private agreement; or, (b) failing this, that the tracts be sold at a public sale." *High*, at 822. On review the Supreme Court stated that

> We have been unable to find any cases in this jurisdiction dealing with the power of a court to order the sale of divorced persons' property, nor has counsel for either side cited us to any such authority. However, in *In re Carroll*, 135 Cal. App. 672, 28 P. (2d) 84 [(1933)], a divorce case, it was held that a court cannot order the sale of property which the parties hold as tenants in common and require a division of the net proceeds as in a partition suit. We think the same rule should apply here.
>
> Under the circumstances, since the trial court recognized the property had been bought for speculation and was worth little now but might increase in value later, it must be held that the court abused its discretion in ordering a sale of the separate tracts. *Cf. Wells v. Wells*, 130 Wash. 578, 228 Pac. 692 [(1924)], where we approved the awarding of undivided half interests in property which, if sold at a forced sale, would have brought far less than its real worth.

*High*, at 822-23. A careful reading of *High* indicates that the court felt that a forced sale would be inequitable because the property would likely increase in value, not because the

court generally lacked jurisdiction to order a forced sale. Thus, *High* is not determinative of the present issue.

■ In summary, finding no Washington case law directly addressing whether courts have jurisdiction to order a forced sale of a couple's house in a dissolution action, and in light of the number of cases in which the Washington Supreme Court has affirmed the lower courts' forced sales of property, we now hold that the trial court had jurisdiction to order the sale of the family home.

Next, Marcia asserts that the trial court's decision that the home should be sold was not supported by substantial evidence. The trial court found that:

> · A. Because of the high monthly expense incident to the residence, respondent/wife cannot afford to keep and maintain same. Mrs. Sedlock does not, and it is contemplated, will not have enough income to pay for the basic expenses totalling $3,631.00 per month, nor would she have sufficient funds to pay for additional maintenance, improvements, or other expenses incident to the residence.
>
> B. Additionally, it does not appear that respondent/wife will be able to make the balloon payment obligation to Mr. Fosness of $266,265.00 in June, 1996.

Based on these findings the trial court concluded that Marcia could not afford to cash Thomas out of the family home. Marcia contends that these findings are not supported by the evidence. We disagree.

It is undisputed that the monthly debt service, real estate taxes, homeowners insurance and average monthly utilities for this home require the expenditure of $3,631 per month. Additionally, the first mortgage must be refinanced in June 1996, by which time the remaining principal balance will be $266,265. The true gist of Marcia's contention is that she believes she really can afford to keep the home, even if she is required to pay a substantial lien to Thomas. Marcia points to the liquid assets she received in those portions of the decree not here at issue, the monthly child support she receives for her two children of a prior marriage and the $30,000 to $40,000 in annual gross income she expects to

receive once she is reestablished in the employment market.[15]

According to the trial court's valuation Thomas' two-fifths share of the net equity in the home is worth $200,290, subject to his two-fifths share of the anticipated federal income tax liability which will fall due following the sale of the home.[16]

Certainly, we believe that, were it not for Thomas' interest in receiving his equity out of the home within a reasonable period of time following the trial, the decision of how she utilizes her share of the community property would be Marcia's decision and not that of the trial court. Just as certainly, we agree with the trial court's assessment of Marcia's realistic ability both to cash Thomas out within a reasonable time and to service the enormous debt load on this property.[17]

---

[15]At the time of the marriage Marcia, then age 35, was a staff accountant at Clark Nuber. Her employment was terminated after the marriage, based on a stated policy that spouses of shareholders would not be employed by the firm. Marcia then returned to school. She became a certified public accountant and obtained a master's degree in taxation. Although she was not yet reestablished in the job market by the time of trial, we certainly agree that Marcia is fully qualified to reenter full employment. As did the trial court, we deem her estimate of her earning capacity over the next few years to be realistic.

Marcia was receiving $1,600 a month as child support at the time of trial, but support for her oldest child was due to cease in a few months. Her oldest child had recently been accepted to attend Notre Dame University commencing in the fall of 1991. As of the time of trial, Marcia was not entitled, by the terms of her previous dissolution decree, to any assistance from the children's father with the cost of their college educations.

Marcia received liquid assets totaling $135,000 and a contract receivable which she believes she could sell for some $164,000.

[16]The trial court recognized, as do we, that the parties might be able to defer the imposition of part or all of the tax, depending upon their respective abilities to timely purchase replacement residences of sufficient value. We also recognize that, if Marcia were to keep the home, no tax liability would be incurred. In that event, however, the amount of any lien she might have to pay Thomas could not be added to the cost basis of the home and the lien proceeds would be tax free to Thomas. I.R.C. § 1041.

[17]In response to Marcia's motion for reconsideration on this issue, Thomas produced an amortization schedule that clearly reflects this is so.

We do not know whether the forced sale issue has become moot during the pendency of this appeal. Even if the home has not yet been sold, we do not know whether, following our remand, Marcia will receive sufficient additional offsetting community value to make keeping the home an affordable option to her. Certainly, to the extent that the parties may still own the home and to the extent that Marcia may receive significant additional community property, we do not wish to preclude the trial court from reconsidering the forced sale of the home. Obviously, Thomas' ultimate share of the value of the home is closely tied to the trial court's decisions following our remand.

That being so, we nevertheless hold that, based on the property award at the first trial, the court did not abuse its discretion in ordering a forced sale. There was more at issue than the *wisdom* of Marcia's desire to keep the home. Thomas' getting his equitable share of the home within a reasonable time coupled with the desirability of an equitable allocation of the tax liability following a sale of the home provided a tenable basis for the court's decision. In such cases as this, it would be form over substance to require a more traditional award, *i.e.*, house to wife; lien to husband in an amount and with a due date which is *tantamount* to a forced sale and which carries with it extremely burdensome tax consequences.

## VI
### CENTOCOR AND AMGEN INVESTMENTS

During marriage, the parties acquired two investments which carried with them warrants to purchase stock at a predetermined price. One of these investments was a one-quarter unit of Amgen Clinical Partners. The purchase price was $25,000. A $5,000 balance was still owing at the time of separation, which Thomas paid from his postseparation earnings.

The other was a one-quarter unit in Centocor Partners III. The purchase price was $25,000. At separation, $21,060 was still owing, payable in installments. Thomas paid $8,166 of

this balance in September 1989, using a bonus earned by him between April and August 1989 (separation occurred on July 14, 1989). We agree with Marcia that the trial court erred in failing to treat the bonus as community property.

The remainder of the debt on Centocor was paid with Thomas' separate earnings. Accordingly, Centocor was paid for with $12,106 of community funds and $12,894 of Thomas' separate income.

At the time of trial, Amgen was worth $207,000 and Centocor was worth $65,000. The parties agree that the warrants which accompany these units are in the nature of a stock option. Because of dramatic increases in the market value of the stock, which increases occurred for the most part after separation, the warrants were valuable commodities indeed.

The trial court determined that 80 percent of Amgen was community property and that 20 percent was Thomas' separate property. As for Centocor, the trial court found that 20 percent was community property and 80 percent was Thomas' separate property. These apportionments roughly correspond to the proportionate shares of community and separate funds the trial court found were used to retire the purchase money obligation.[18]

Marcia contends that 100 percent of these assets are community property subject to Thomas' right to be reimbursed for his separate payments. Thomas argues that the trial court did not err. Marcia is correct.

■ Property is characterized as of the date of its acquisition. *Burch v. Rice*, 37 Wn.2d 185, 190, 222 P.2d 847 (1950). The test of character is "whether it was acquired by community funds and community credit, or separate funds and the issues and profits thereof". *Katterhagen v. Meister*, 75 Wash. 112, 115, 134 P. 673 (1913) (quoting *United States Fid. & Guar. Co. v. Lee*, 58 Wash. 16, 107 P. 870 (1910)). These

---

[18]Because the trial court erred with respect to the character of the bonus, the ratio is closer to 50:50, with respect to Centocor.

investments were acquired with community funds and community credit.

Thomas nevertheless argues that he should receive more than a straight dollar for dollar credit for the payments he made on the Amgen and Centocor investments from his postseparation earnings. He asserts that, under *In re Marriage of Elam*, 97 Wn.2d 811, 816, 650 P.2d 213 (1982) and *In re Marriage of Bepple*, 37 Wn. App. 881, 884-85, 683 P.2d 1131 (1984), appreciation in the value of the assets should be allocated in the same ratio that separate and community resources contributed to the assets.

In *Elam*, the wife owned a home prior to marriage. During the marriage the community contributed toward improvement on the home. The house appreciated in value substantially. The Supreme Court held that the community was "entitled to a share of the increase in value due to inflation in proportion to the value of community contributions to the property." *Elam*, at 817.

In *Bepple* the husband's separately owned business appreciated substantially during the marriage. The community had extended credit and the wife had loaned her separate property to guarantee a bank loan to assist the corporation in paying its operating expenses and to redeem the stock of a departing stockholder. The Court of Appeals held that, in determining how to allocate the appreciation in value of the husband's corporation, the trial court should take into account the contributions by the community and from the separate property of the wife. *Bepple*, at 884-85.

Thomas asserts that the same reasoning should apply where one spouse uses separate property to pay toward a community purchase money obligation incurred for the purchase of an appreciated community asset.

Here, the trial court applied an *Elam* rationale. This was error because of the *nature* of these assets. As admitted by Thomas in his brief and at oral argument, the warrants operate similarly to a stock option, giving the marital com-

munity the privilege of purchasing the stock at a fixed price regardless of the later appreciation in the value of the stock.

Here, Thomas' separate contribution to the encumbrances on Amgen and Centocor had nothing to do with the increases in value of the stocks at issue. Those increases were entirely due to market conditions. Thomas admits that the character of the Amgen and Centocor assets was fixed at the time of their purchase — as community property. He wishes to measure his separate equitable lien, however, by a percentage of the increase in value in proportion to his contribution. He argues that he is so entitled because the bulk of the increase due to market conditions occurred after he made his separate contribution.

This is the very argument which was *disapproved* in *Elam*. Instead, the *Elam* court approved of the rationale of *In re Marriage of Johnson*, 28 Wn. App. 574, 625 P.2d 720 (1981). *See Elam*, 97 Wn.2d at 815-16. There, the husband purchased a home subject to a mortgage prior to marriage. After marriage, the marital community paid the mortgage payments, but made only some $492 worth of improvements. Natural inflationary forces operated to increase the value of the home during marriage. The minor improvements did nothing to increase that value. Neither did the mortgage payments. In *Johnson*, the issues and profits were entirely the husband's separate property as defined by RCW 26.16-.010. At most, the marital community had an equitable claim for reimbursement of the modest sums expended to improve the property. *Johnson*, 28 Wn. App. at 577.

We hold that Amgen, worth $207,000 at the time of trial, is entirely community property. Thomas is entitled to be reimbursed $5,000 for his separate contribution to the purchase price. Likewise, Centocor, worth $65,000 at the time of trial, is entirely community property. Thomas is entitled to be reimbursed $12,894 for his separate contribution to the purchase price.[19]

---

[19]We do not determine whether Thomas may be entitled to any interest on these payments. The parties may wish to brief this question for the trial court, following our remand.

## VII
### APARTMENT RENTS AND EARNEST MONEY
### FOR CONDOMINIUM

Finally, Marcia argues that the trial court erred in failing to charge Thomas' side of the community ledger with $28,000 which he spent secretly to rent an apartment during the year prior to separation and with $14,700 which he paid as earnest money for the purchase of a condominium unit, shortly after separation. Thomas later transferred the condo unit to his parents and they reimbursed him the $14,700.

The findings and conclusions entered by the trial court are silent as to these two issues. Because we are remanding, we direct the trial court to address these issues.

■ We find no clear, cogent and convincing evidence in the record that the $14,700 payment for the condo was made with Thomas' separate earnings as he contends. Because Thomas contends that the payment was made with his post-separation earnings, he has the burden of proving this by clear and convincing evidence. *Berol v. Berol*, 37 Wn.2d 380, 381-82, 223 P.2d 1055 (1950). We leave it to the discretion of the trial court whether to allow Thomas to present additional evidence. If no additional evidence is provided, this payment, made so shortly after separation, is presumptively community property. Although Thomas earns a substantial income, his income was heavily encumbered in the months following trial. Under these facts, it cannot be presumed that he paid for the condo purchase with his separate earnings. Thomas must prove this was so.

■ As for the $28,000 in apartment rentals the trial court should consider *In re Marriage of Clark*, 13 Wn. App. 805, 808, 538 P.2d 145 (trial court may consider squandering of assets by one spouse in distributing the parties' assets), *review denied*, 86 Wn.2d 1001 (1975).

We leave it to the sound discretion of the trial court to determine the weight to place upon Thomas' argument that Marcia received sufficient postseparation economic benefits from him to offset these expenditures.

## CONCLUSION

In summary, there is not sufficient evidence in the record to support the trial court's apportionment of Plans 1 and 2 and the professional goodwill. The trial court erred in apportioning Amgen and Centocor by the *Elam* formula. The trial court should decide, one way or the other, whether to charge Thomas for the $42,700 spent on the apartment rents and the condominium. To the extent that the parties still own the family home, Thomas' proportionate share and the issue of a forced sale should be revisited in view of the trial court's ultimate resolution of the errors here found and in light of any changes in the parties' respective financial circumstances which may have occurred during the pendency of this appeal.

We reject Thomas' contention that there is not sufficient community money here at stake to justify a remand. As of the time of trial, there was great disparity in the parties' respective economic circumstances. Sums which Thomas may deem insignificant are significant, indeed, to a person in Marcia's circumstances. The trial court determined that Marcia was entitled to 55 percent of the net community estate. In terms of Amgen and Centocor alone we calculate that the marital community interest is $272,000 to be offset by $17,894 paid by Thomas, for a net community interest of $254,106. The trial court's errors here resulted in a net loss to the marital community in excess of $75,000. If Marcia is entitled to receive 55 percent of that additional community value, her loss exceeded $45,500. If she is entitled to 55 percent of the sums Thomas spent for the apartment rent and condominium, another $23,485 may be added to her side of the ledger, bringing her potential loss to more than $65,000 *before* the taking of additional testimony with respect to the reapportionment of the professional goodwill/Plan 1 and 2 assets.

Although Marcia received community assets which the trial court valued at $504,449, and although she received significant educational benefits during the marriage, Marcia's earning capacity appears to be relatively modest in

comparison to that of Thomas and she is facing significant expenditures for the college educations of her two children. Thomas, on the other hand, left the marriage unencumbered in terms of parental obligations and with an earning capacity far greater than that Marcia can ever likely achieve. Such additional sums as Thomas may be required to pay Marcia can be replaced by him with far greater ease than could Marcia recoup her losses resulting from the errors here at issue.

Although the trial court stated in its conclusion of law 2 that its characterization of the properties at issue did not significantly influence its decision, we believe that the trial court was intending to say that it believed it had reached an equitable result by awarding Marcia 55 percent of the net community estate, based on an underlying conclusion that there had been no significant legal or factual errors in apportionment. In any event, the trial court's statements contained in conclusion of law 2 do not alter the standard of review. Contrary to Thomas' assertions during this appeal, we conclude that the trial court's errors prevented an equitable result.

Accordingly, we reverse and remand for such further proceedings as shall be consistent with this opinion.

WEBSTER, C.J., and BAKER, J., concur.

Review denied at 122 Wn.2d 1014 (1993).