# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Marriage of | No. 84526-8-I |
| CHRISTOPHER JOSEPH WALSH, JR., | DIVISION ONE |
| Respondent, | UNPUBLISHED OPINION |
| and | |
| ISABELLA ZENI ROSFORD, | |
| Appellant. | |

BIRK, J. — Isabella Rosford and Christopher Walsh, Jr. share two daughters, E.W. and A.W. Walsh filed a petition for dissolution and following 13½ days of trial testimony, the trial court entered its final orders. Rosford appeals and requests a new trial, arguing several findings of fact are unsupported by substantial evidence. Finding no error, we affirm.

I

On March 1, 2014, Isabella Rosford and Christopher Walsh were married in Texas. Walsh and Rosford are the parents of E.W. and A.W., who were seven and five years old, respectively, at the time of trial. Rosford and Walsh moved to Washington in November 2019.

On March 6, 2020, Rosford reported to police that she and Walsh had had an argument the night before during which Walsh slammed a bedroom door, hitting Rosford in her face. Rosford told police she was injured and would send a photo

she had taken showing the injury. Rosford, Walsh, and their roommate Marlen Cardenas provided statements to the police. No charges were filed. The nature of the fight and whether Rosford was injured were disputed at trial. Rosford elicited that Walsh admitted to responding police officers that the door struck her face. Walsh testified he did not feel the door hit anyone and believed it had struck Rosford only because she said so. On cross-examination by Walsh's counsel, an investigating officer testified that he did not recall seeing Rosford having any specific wound.

On May 11, 2020, Rosford filed a petition for order of protection in Snohomish County District Court, Evergreen Division. Rosford alleged E.W., A.W., and herself were victims of domestic violence committed by Walsh. Rosford alleged that on May 9, 2020, Walsh claimed he would kill himself because Rosford was causing him to lose his ability to be a father. Walsh contacted the police to have himself brought to a hospital. Rosford alleged a police officer transported Walsh to a hospital, but Walsh was not committed and chose to leave. Rosford made additional allegations that Walsh threatened to kill her and take the children, had raped her and had become "violent and mentally unhinged," had inserted chemicals into her vagina, had damaged property in anger, had bruised and was emotionally abusive to the children, contacted her up to 40 times a day and refused to leave when asked, had made "over 100" suicide threats, threw objects, and had threatened Rosford with box cutters. Rosford stated she feared Walsh would "rape me again" and "harm or rape my children because he has [been] physically violent with them in the past."

2

Rosford obtained a temporary protection order, as a result of which, Walsh testified, he did not return to the house. At trial, Rosford testified she had never feared Walsh would sexually abuse the children. Although Rosford made statements to that effect in her petition for an order of protection, she implied (despite a hearsay objection) that she included those statements at the suggestion of a court clerk. She testified she omitted the incident that had prompted her to call the police in March. Rosford also testified that Walsh "hadn't hurt the children" other than on one occasion when he left marks on their arms, which he said was accidental. Rosford testified at trial that Walsh raped her when they lived in Texas by engaging in nonconsensual sexual intercourse with her.

On May 26, 2020, Walsh filed in Snohomish County Superior Court a petition for dissolution of his marriage to Rosford. On June 18, 2020, the court appointed Edward Schau, PhD, as the children's guardian ad litem (GAL) and set a deadline for his GAL report as August 24, 2020.

Also on June 18, 2020, the superior court entered an order denying Rosford's request for a final protection order because Rosford failed to establish domestic violence by a preponderance of the evidence. Based on Rosford's petition and pleadings, the court found the issues raised would be more appropriately addressed under Walsh's dissolution action. Nevertheless, in the temporary parenting plan entered the same day, while the court reserved the issues of neglect, child abuse, and domestic violence, the court limited Walsh to supervised contact every Saturday from 12:00 p.m. to 4:00 p.m. The court ordered either a professional supervisor or an agreed lay supervisor.

Trial was convened on 16 dates spanning June 6, 2022 to August 15, 2022, and included 13½ days of testimony. Following trial, the trial court entered four orders: a dissolution decree, findings and conclusions about a marriage, a parenting plan, and a final child support order. The court entered extensive findings of fact, discussed below, and ordered that the children reside with Walsh, with Rosford to have supervised visitation together with restrictions pursuant to RCW 26.09.191. The court awarded Walsh $35,000.00 in partial attorney fees. On September 13, 2022, the trial court denied Rosford's motion for reconsideration or for a new trial and awarded Walsh $2,500.00 in additional attorney fees. Rosford appeals.

II

Initially, Walsh argues the trial court's findings of fact are verities on appeal because Rosford failed to assign error to any of them in her opening brief. Rosford contends her brief makes clear that she assigned error to all of the trial court's findings in the parenting plan related to residential time, domestic abuse, the need for supervision, and the limited decision making imposed on her.

In general, we review the trial court's dissolution orders for abuse of discretion. In re Marriage of Buchanan, 150 Wn. App. 730, 735, 207 P.3d 478 (2009). A trial court abuses its discretion when its decision is manifestly unreasonable, based on untenable grounds, or based on untenable reasons. State v. Dye, 178 Wn.2d 541, 548, 309 P.3d 1192 (2013). Findings of fact are reviewed for substantial evidence. In re Marriage of Watanabe, 199 Wn.2d 342, 348, 506 P.3d 630 (2022). Substantial evidence is evidence sufficient to persuade

4

a fair-minded, rational person of the truth of the finding. In re Marriage of Akon, 160 Wn. App. 48, 57, 248 P.3d 94 (2011). In determining the sufficiency of evidence, an appellate court need only consider evidence favorable to the prevailing party. Id. Unchallenged findings of fact are accepted as true on appeal. In re Marriage of Laidlaw, 2 Wn. App. 2d 381, 386, 409 P.3d 1184 (2018). We defer to the trier of fact for resolution of conflicting testimony, evaluation of the evidence's persuasiveness, and assessment of the witnesses' credibility. In re Parentage of G.W.-F., 170 Wn. App. 631, 637, 285 P.3d 208 (2012).

RAP 10.3(g) requires a separate assignment of error for each challenged finding of fact with reference to the finding by number. The rules of appellate procedure are to "be liberally interpreted to promote justice and facilitate the decision of cases on the merits. Cases and issues will not be determined on the basis of compliance or noncompliance with these rules except in compelling circumstances where justice demands." RAP 1.2. We wield discretion to consider cases and issues on the merits under RAP 1.2. State v. Olson, 126 Wn.2d 315, 323, 893 P.2d 629 (1995). This discretion should be exercised unless there are compelling reasons not to do so. Id. Where the nature of the appeal is clear and the relevant issues are argued, citations provided, and the respondent is not prejudiced, there is no compelling reason for an appellate court to not consider the merits of the case or issue. Id.

Rosford's opening brief failed to comply with RAP 10.3 because Rosford did not identify the specific findings of fact she is challenging. Rosford's attempt to comply belatedly by block quoting about 25 findings of fact in her reply brief is,

5

on its own, insufficient to remedy these failures. See State v. Moses, 70 Wn.2d 282, 284-85, 422 P.2d 775 (1967) (declining to consider findings of fact as timely challenged when set out verbatim for the first time in appellants' reply brief); Sherrell v. Selfors, 73 Wn. App. 596, 599, 871 P.2d 168 (1994) (holding findings of fact challenged only in the appellants' reply brief to be accepted as true on appeal).

However, most issues Rosford raised were sufficiently clear for Walsh to discern and answer. The thrust of Rosford's appeal is that she did not receive a fair trial and therefore is entitled to a new one. Walsh does not demonstrate he suffers unfair prejudice if we reach the merits of Rosford's appeal. Accordingly, we exercise our discretion and consider the assignments of error that are properly before us. We set forth the specific findings of fact we deem sufficiently challenged in each section below. The remaining findings of fact are accepted as true.

III

Rosford argues the trial court erred by failing to remove Dr. Schau as the GAL and strike his reports. Rosford contends Dr. Schau violated several provisions of the Superior Court Guardian ad Litem Rules (GALRs) and Snohomish County Local Guardian ad Litem Rules (SCLGARs). We disagree.

A trial court's denial of a motion to remove a GAL is reviewed for abuse of discretion. In re Marriage of Bobbitt, 135 Wn. App. 8, 23, 144 P.3d 306 (2006). The GAL's role is to investigate and report factual information regarding the issues ordered to be reported or investigated to the court. RCW 26.12.175(1)(b).

A

On April 12, 2021, Dr. Schau completed the GAL report. In his report, Dr. Schau detailed the backgrounds of Walsh and Rosford, including their social, education, and employment histories. Dr. Schau observed Walsh and Rosford visiting a park with their children and reported positive interactions during both visits. Dr. Schau reviewed many declarations filed on behalf of both parents as to their parental responsibilities. Dr. Schau concluded there was "strong evidence" that Walsh was a fully engaged parent when at home. As to allegations of domestic violence and rape, Walsh denied ever hitting, threatening or abusing Rosford, but accused her of physically hurting him. Dr. Schau noted it was difficult to discern what happened between Walsh and Rosford and acknowledged they "did seem to argue a great deal." While Rosford did obtain a temporary protection order, her petition was later dismissed, as there did not appear to have been a sufficient basis for Rosford's concern about physical abuse or fear of Walsh kidnapping the children. Each parent had mental health concerns and was seeing a therapist. Dr. Schau could not say whether Rosford truly feared Walsh, but opined that she seized "on the moment" to "erase" Walsh from her life and the lives of their children. Dr. Schau noted Rosford removed almost $14,000.00 from her and Walsh's joint account for the purpose of paying back the "forbearance amount owed on their mortgage." Walsh, having just left the hospital, was left with whatever little amount he had in his personal account. Dr. Schau noted there was no need to pay the bank at the time and they owed the bank less than half of the $14,000.00 Rosford removed.

7

Dr. Schau opined, "Much of what Isabella says and writes is questionable," and she "distorts and minimizes in order to foster the illusion that she has done nothing wrong." Dr. Schau characterized Rosford as having a "compulsive personality," "very intense," "the dominant one in this relationship," reactionary, uncooperative, and "creates conflict," while Walsh came across as "laid back" and "conflict avoidant." Dr. Schau noted of all the declarations he reviewed, most described Walsh as an active and caring parent, while a few spoke well of Rosford as a parent and showing generosity as a friend, but concerns were raised about Rosford's anger and control problems. The park visits showed Dr. Schau that there is a strong attachment between Walsh and the children. Dr. Schau observed, "[Rosford] create[d] controversy on a very small thing." However, Dr. Schau stated Rosford has "good interpersonal skills and is capable of expressing warmth and affection."

Dr. Schau recommended Walsh be the primary caretaking parent on what would have been close to a 50-50 split, because he is "more consistent and reliable" than Rosford. Dr. Schau did not find any basis for any restrictions on parenting, but noted Rosford comes "close to the edge with respect to abusive use of conflict," and her "inability or [un]willingness to cooperate justifies a basis for sole decision-making" with Walsh. Dr. Schau did not find a sufficient basis for domestic violence with either Rosford or Walsh.

On October 22, 2021, Rosford filed a motion to remove Dr. Schau as the GAL and strike his report. Rosford argued Dr. Schau violated several provisions of SCLGAR Rule 7.1. Rosford contended Dr. Schau improperly refused to

8

interview several key witnesses, including the children, failed to include in the GAL report specific facts or reasons of hers explaining her actions, and erroneously relied on Walsh's statements for domestic violence and alcohol abuse issues.

On October 27, 2021, Walsh filed his first objection and motion to strike and/or deny Rosford's motion to remove Dr. Schau as the GAL and award Walsh terms and attorney fees. The same day, Rosford signed a declaration opposing Walsh's motion and asking the court to maintain the parenting plan until trial. On October 29, 2021, Walsh filed a second objection.

On October 31, 2021, Dr. Schau filed an addendum to his GAL report. Dr. Schau stated his new report was based on having reviewed "all attorney emails since 4/12/21 related to various conflicts," pleadings associated with "this 11/03/21 Hearing"—one issue at which was Rosford's motion for Dr. Schau's removal—and "two videos of recent exchanges." Dr. Schau stated, "[Rosford] has traveled far over the edge of what is acceptable because of her abusive use of conflict and her alienation of affection," and was "escalating the conflict." Dr. Schau recommended Walsh be awarded sole decision-making, which should take effect immediately, because of the parents' inability to cooperate and Rosford's alienation of affection and engagement in abusive use of conflict. Dr. Schau deemed it necessary that Walsh immediately become the parent with whom the children reside the majority of the time. Dr. Schau denied that his addendum report was influenced by Rosford's motion to have him removed as GAL.

On November 3, 2021, a court commissioner denied Rosford's motion to remove the GAL and strike his report. On November 24, 2021, Rosford filed a

motion to compel Dr. Schau to produce his complete file. On December 8, 2021, the court entered its order on Rosford's motions to compel discovery from Walsh and Dr. Schau. The court ordered Dr. Schau to make his records available to Rosford by December 9. The court later found Dr. Schau substantially complied with Rosford's discovery requests.

Before calling Dr. Schau at trial, Rosford renewed her motion to remove him as the GAL and strike his report. Rosford argued significant new materials from his file had been disclosed in the two weeks leading up to trial. The trial court ruled Rosford had the right to question Dr. Schau before he testified about items she believed she had not received. The trial court ordered the parties and the GAL to meet and confer concerning the completeness of the GAL's file production before the GAL testified. Rosford later argued she found several additional e-mails with substantive information that had not been disclosed despite Dr. Schau indicating he had provided everything, and Dr. Schau had been biased against her. The trial court ruled that if Rosford believed the GAL was biased against her, the proper remedy was to explore that theory during examination of the witness, during which time the court would determine the GAL's credibility and bias.

B

GALR 2 articulates the general responsibilities of GALs. Rosford claims Dr. Schau violated the following provisions:

> (b) Maintain independence. A guardian ad litem shall maintain independence, objectivity and the appearance of fairness in dealings with parties and professionals, both in and out of the courtroom.

10

(c) Professional conduct.  A guardian ad litem shall maintain the ethical principles of the rules of conduct set forth in these rules and is subject to discipline under local rules established pursuant to rule 7 for violation.

(d) Remain qualified for the registry.  Unless excepted by statute or court rule, a guardian ad litem shall satisfy all training requirements and continuing education requirements developed for Titles 13 and 26 RCW guardians ad litem by the administrator of the courts and for Title 11 RCW guardians ad litem as required by statute and maintain qualifications to serve as guardian ad litem in every county where the guardian ad litem is listed on the registry for that county and in which the guardian ad litem serves and shall promptly advise each such court of any grounds for disqualification or unavailability to serve.

. . . .

(f) Treat parties with respect.  A guardian ad litem is an officer of the court and as such shall at all times treat the parties with respect, courtesy, fairness and good faith.

(g) Become informed about case.  A guardian ad litem shall make reasonable efforts to become informed about the facts of the case and to contact all parties.  A guardian ad litem shall examine material information and sources of information, taking into account the positions of the parties.

. . . .

(i) Timely inform the court of relevant information.  A guardian ad litem shall file a written report with the court and the parties as required by law or court order or in any event not later than 10 days prior to a hearing for which a report is required.  The report shall be accompanied by a written list of documents considered or called to the attention of the guardian ad litem and persons interviewed during the course of the investigation.

(j) Limit duties to those ordered by court.  A guardian ad litem shall comply with the court's instructions as set out in the order appointing a guardian ad litem, and shall not provide or require services beyond the scope of the court's instruction unless by motion and on adequate notice to the parties, a guardian ad litem obtains additional instruction, clarification or expansion of the scope of such appointment.

. . . .

       (o) Perform duties in timely manner.  A guardian ad litem shall perform responsibilities in a prompt and timely manner, and, if necessary, request timely court reviews and judicial intervention in writing with notice to parties or affected agencies.

       (p) Maintain documentation.  A guardian ad litem shall maintain documentation to substantiate recommendations and conclusions and shall keep records of actions taken by the guardian ad litem.  Except as prohibited or protected by law, and consistent with rule 2(n), this information shall be made available for review on written request of a party or the court on request.  Costs may be imposed for such requests.

GALR 2(b)-(d), (f)-(g), (i)-(j), (o)-(p) (boldface omitted).

Rosford argues Dr. Schau violated GALR 2(b) by concealing his case file, details for plans for an ex parte hearing and contempt motions, and requests that Dr. Schau address the exchange issues.

Rosford identifies no prejudice she suffered as a result of these asserted disclosure failures.  The trial court advised at the end of trial day 12 that the court would expect Dr. Schau's testimony to be completed the following day.  Rosford cross-examined Dr. Schau concerning the e-mail review from the meet and confer. Rosford established some instances of documents Dr. Schau had not provided to her.  Rosford was permitted to cross-examine the GAL for five and a half hours, during which Rosford highlighted many e-mail communications.  Rosford never showed, however, that any withheld e-mail communications were germane to any of Dr. Schau's opinions or decisions before the trial court, or could have affected any rulings.  Rosford also does not refer to any such content in her brief on appeal. The trial court's remedy of ordering a further meet and confer during trial, review

of the GAL's e-mails, and affording extensive cross-examination met any objection based on discovery disclosure.

Rosford argues Dr. Schau violated GALR 2(c) and WAC 246-924-367 by allowing his wife to "participate in the investigation and offer her opinions about the case." WAC 246-924-367 prohibits psychologists from delegating professional responsibilities to a person not qualified or not appropriately credentialed to provide such services.

Dr. Schau stated he had Mary Schau, his wife and assistant, review videos of the parties exchanging the children, "alcohol videos," and Walsh's past YouTube[1] videos. Dr. Schau testified that his wife's comments after watching the videos were that they were "basically just sophomoric rants," and "immature." Mary Schau has a master's degree in education, K-12, regular education, and special education. For about 18 years, she taught Advanced Placement English at a high school. She is not a medical professional, GAL, or parenting evaluator. Dr. Schau described the extent of her assistance as editing the reports, reviewing the videos the parties submitted to him, and providing notes to him. Dr. Schau testified he did not delegate responsibility to Mary, but only asked for her assistance and opinion, because he assumed responsibility for the opinions he finalized in his report. Rosford does not show Dr. Schau violated GALR(c) or WAC 246-924-367 by relying on Mary Schau's review and summary of some of the available information.

---

[1] YouTube is a social media platform for viewing and sharing videos.

13

Rosford argues Dr. Schau violated GALR 2(d). At trial, Dr. Schau testified he was no longer on the GAL list in Snohomish County and had not been since two years after his appointment in this case. This was because Dr. Schau was "semi-retired" and therefore retired from the GAL registry. Rosford fails to point to any evidence that Dr. Schau failed to remain qualified to serve as GAL or that his not doing so affected his opinions.

Rosford argues Dr. Schau violated GALR 2(f). Rosford points only to matters in which she disagreed with the GAL in the characterization of various facts, and to his referring to certain of her behavior as "petty." A party's disagreement with the GAL over the characterization of facts reasonably subject to interpretation, without more, does not show lack of independence by the GAL. Here, Rosford assumes the truth of her own characterizations to attempt to portray the GAL's disagreement as lack of independence.

Rosford argues Dr. Schau violated GALR 2(g) for failing to request health records, speak to her therapist, investigate her abuse allegations against Walsh, and interview witnesses with knowledge of relevant facts. Dr. Schau, a clinical psychologist, interviewed the parties, which he testified was sufficient. He testified to his not needing to take additional steps several times, for instance testifying, "I wasn't provided with her Social Security Disability request, and it might have been helpful, particularly Social Security Disability. I don't think that there's much value added in all of that. I'm a psychologist. I can meet with [Rosford]. I think I can fairly well determine early on whether her psychological status is such that as it relates to parenting, the same with [Walsh]."

14

The court did not order Dr. Schau to review medical records, but only investigate "mental health issues" of both parties and "physical health issues" of Rosford. He testified he reviewed some U.S. Department of Veterans Affairs (VA) records regarding Rosford's mental health. He did not know whether posttraumatic stress disorder affects Rosford. Dr. Schau was reluctant to contact any of Rosford's therapists, former or current, because he thought that would affect Rosford's ability to receive treatment since patients are worried about what may be disclosed to a GAL. Also, therapists are not "forensic" and do not hear both sides. Dr. Schau did not speak with any of Walsh's therapists.

Dr. Schau did not review Rosford's 700 pages of Social Security records or 2,400 pages of VA records. He did not think reviewing them would be worthwhile to complete his tasks as GAL. Dr. Schau never interviewed the children even though Rosford several times and Walsh at least once requested that he do so. Dr. Schau testified that while children are sometimes interviewed for parenting evaluations, it would be "appalling" to interview the children to figure out what is happening between the parents' homes. Dr. Schau viewed this as putting the children in the middle of the conflict to decipher what had transpired in their parents' homes. He testified GALs do not talk to kids about residential preferences or what is going on in the family until they are at least 10 years old. Based on Rosford's e-mails, Dr. Schau was concerned that Rosford would coach the children if he decided to interview them. Because of the extensive declarations, interviews of Rosford and Walsh, and observations of the children with each parent at the park, Dr. Schau felt he had sufficient information to write his report without

15

interviewing the children. Dr. Schau's testimony supports his decision to investigate and complete his report as he saw fit. The court order appointing Dr. Schau and outlining his duties did not require he perform them in any particular way. That Rosford wanted him to review more or other materials does not mean Dr. Schau failed to become informed about the case in violation of GALR 2(g). Rosford's criticisms pertain solely to the weight of Dr. Schau's testimony, and she had the opportunity to explore them fully on cross-examination.

Rosford argues Dr. Schau violated GALR 2(j) by investigating the parties' financial matters. On cross-examination, Dr. Schau testified a review of the parties' finances was not part of the court order outlining his duties. The cross-examination on this point concerned Rosford's $14,000.00 withdrawal from savings. In his report, Dr. Schau referred to this fact as it related to parenting, because it showed an effort to disadvantage Walsh with respect to the children at a time when Rosford had obtained a court order for supervised visitation, Walsh was just out of the hospital, and he had no money. Dr. Schau did not violate GALR 2(j).

Rosford argues Dr. Schau violated GALR 2(i) both by submitting untimely reports and not including all of his recommendations in the reports. Dr. Schau's report was not timely as is required under GALR 2(i), but he explained the he had needed to continue the investigation. In some instances, Dr. Schau suggested slight amendments to his original recommendations concerning the balance of residential time between the parents, but he consistently maintained his central position that both parents were bonded with the children and should share

16

residential time. The GAL never testified to different or new recommendations that were significantly out of line with his main opinions outlined in his reports.

Rosford argues Dr. Schau violated GALR 2(o). Rosford points to matters she says Dr. Schau mistook, including the exact time frame during which she came out as a lesbian, the full extent of Walsh's mental health diagnoses and treatment in Texas before they moved to Washington, the degree of Walsh's desire or not to move to Washington, and the exact nature of Walsh's one documented instance of having a level of self-harm ideation. None of these matters had significant bearing on the ultimate questions of residential time and parenting restrictions, especially considering it was always undisputed Rosford also had potentially significant diagnoses. These minor errors do not show a violation of the GALR rules.

Rosford argues Dr. Schau violated GALR 2(p). These final alleged violations appear to be aimed at Rosford's complaints about the GAL's level of discovery compliance. Rosford cross-examined Dr. Schau over several hours nearly exclusively on the subject of e-mail communications between him and Walsh's counsel's office. During this extensive cross-examination, Rosford had the opportunity to show that Dr. Schau's opinions were not reliable or that she had been unfairly disadvantaged. Although she identified many e-mails that had not originally been produced in discovery, Rosford never identified any content of any e-mail that materially related to Dr. Schau's opinions. If Dr. Schau's discovery production violated GALR 2(j) or (p), which Rosford never established, any such violation was minor in nature and fully addressed by the trial court's order for a

17

further meet and confer during trial and the court allowing of extended cross-examination.

In Bobbitt, the GAL violated GALR 2 by failing to do an investigation that included any witnesses from one side, among other deficiencies. 135 Wn. App. at 26-27. This court held the trial court nevertheless did not err by refusing to remove the GAL, because there was time left before trial to remedy the deficient investigation. Id. at 27. In this case, Rosford fails to establish a violation of GALR 2. Even in the best possible light for Rosford, she could establish at most ministerial violations such as the timing of the report and non-substantive discovery violations that were fully cured by the trial court's order to the parties to meet and confer. Under Bobbitt, the trial court did not abuse its discretion in declining to remove the GAL.

IV

Rosford challenges the trial court's domestic abuse findings. We consider Rosford as having adequately challenged the following findings of fact:

> 16.14 Mother claims Father was verbally, emotionally and physically abusive during their marriage, yet the evidence does not support Mother's allegations. For example, mother alleged that father intentionally assaulted her on March 5, 2020 by slamming a door in her face causing her lip to bleed. Yet the police report, admitted without objection as Exhibit 357, indicates that the mother "*did not appear to have any visible physical indications of a broken lip.*" The admitted exhibit also indicates "*the two young children were nearby... seemed to be happy and smiling, talkative and did not seem to be frightened by my presence or of the disturbance that had taken place*". The officer testified credibly under oath that he did not see any injuries the mother claimed. Mother claimed she had photos with the police and to opposing counsel through her discovery, but none were produced despite her

18

testifying that she had a busted lip and bleeding. Witnesses for both parties testified that they did not observe Father abusing Mother. Witnesses for Father testified that Mother was the dominant party of the two.

16.15 Mother introduced a photo exhibit to show a hole she alleged father punched in a wall (Exhibits 414 and 415). This Court finds the exhibits clearly show the wall damage to be at the exact level of where the door handle would impact drywall if opened quickly or forcefully, or without care, and is too low an angle to be caused by someone of regular height punching a wall in aggression. This Court finds that this photo exhibit, when considered together with testimony of witnesses, is another example of mother's lack of credibility and her attempt to manipulate and create a narrative to her advantage.

Rosford argues the trial court failed to credit the police officer report and witness statements in exhibit 357 concerning the March 2020 domestic violence report. The trial court did not fail to credit exhibit 357. Walsh testified his statements in the report were based on Rosford's statements. The investigating officer testified domestic violence did take place in the March 2020 incident, but specified "[t]hat doesn't have to be physical injury." The officer testified only that "we did determine that a domestic violence verbal altercation occurred." The officer denied seeing that Rosford was injured, as she claimed. The evidence of a domestic violence assault was equivocal, and the officer's opinion concerning domestic violence was not controlling on the court's assessment.

Rosford argues there is substantial evidence "that the abuse happened" and the only evidence it did not is Walsh's denial, which contradicts what he told the police. However, Rosford testified she had denied abuse in medical reports. And Walsh testified they had an argument, but he did not think he ever hit anyone with a door.

Rosford confuses the standards we apply. While there may be evidence to support *Rosford's interpretation* of the evidence, we determine whether there is substantial evidence to support *the trial court's findings*. The trial court may disbelieve testimony, even if it is not contradicted by other evidence, particularly where other facts and circumstances tend to discredit it. Riblet v. Spokane-Portland Cement Co., 45 Wn.2d 346, 349, 274 P.2d 574 (1954). We do not review the trial court's credibility determinations or weigh conflicting evidence. In re Marriage of Black, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017). The trial court's domestic abuse findings are supported by substantial evidence.

V

Rosford challenges the trial court's parenting plan. We consider Rosford as having adequately challenged the following findings of fact and other rulings:

3. Reasons for putting limitations on a parent (under RCW 26.09.191)

. . . .

> Emotional or physical problem - Isabella Rosford has a long-term emotional problem that gets in the way of her ability to parent
>
> Abusive use of conflict - Isabella Rosford uses conflict in a way that endangers or damages the psychological development of a child listed in 2., examples of this abusive use of conflict are so numerous, they are further described in Paragraph 16 of this Order.
>
> Other:
>
> Mother's Attempted Alienation of Children from Father.
>
> Mother's Harmful Conduct Re Children's Medical/Health.

4.      Limitations on a parent

The following limits or conditions apply to Mother

Limited contact as follows:

Supervised contact. All parenting time shall be professionally supervised as set forth below and in section 8. Any costs of supervision must be paid by Isabella Rosford.

Every other weekend: Mother shall have up to 6 hours supervised visitation on Saturday and up to 6 hours supervised on Sunday.

Evaluation or treatment required. Isabella Rosford must:

Complete a psychological evaluation with a psychologist approved by the father.

Said psychological evaluation shall be paid by the mother.

Mother shall begin the evaluation within 30 days and shall provide proof to father's counsel that she has done so.

Said evaluation shall include collateral contact with the father, with the GAL, review of the Guardian ad litem reports, and with any third parties requested by the psychologist.

Mother shall provide all VA Medical Records and Social Security Records.

Mother shall sign all releases necessary for the evaluation including having the evaluator provide a copy of the evaluation directly to the father.

If there are recommendations arising from the evaluation, the mother shall immediately comply. Mother shall sign releases permitting any professional involved with the recommendations to provide documentation evidencing dates and status of mother's participation.

Mother is required to provide any professional involved in this case copies of the two Guardian ad litem reports by Dr. Schau (April 2021 and October 2021) and a copy of

the Final Parenting Plan. Said professional(s) shall sign a written document affirming he/she received these documents and will review these.

If mother fails to comply with any of the above, then mother's visitation with the girls shall remain in Phase One set forth in section 8.

Father may seek the appointment of a Case Manager if Mother's conduct continues to harm the children, violate this parenting plan or if she harasses the Father. The Court shall require Mother to pay all costs of the Case Manager unless the Case Manager believes the Father should contribute based on his conduct (i.e. excessive emails, etc.).

. . . .

8.    School Schedule

. . . .

The children are scheduled to reside with Chris Walsh. Mother's time with the children is set forth in Phase ONE or in Phase TWO.

PHASE ONE: Mother has to comply with obtaining the psychological evaluation as set forth in section 4. If there are no recommendations from the evaluation, then PHASE TWO shall begin. If there are any recommendations from the psychological evaluation, then mother shall comply with the recommendations for at least six consecutive months before moving to PHASE TWO. Mother shall sign releases from any professional involved with the recommendations arising from the psychological evaluation. If mother fails to remain in compliance with any/all of the recommendations for six consecutive months, then she needs to have another six months of consecutive compliance before PHASE TWO begins. This requirement for six months of compliance before PHASE TWO may continually be required if mother is unable to repeatedly comply.

PHASE TWO: The Mother shall have unsupervised time with the children every other week from Thursday after school until Monday morning before school. If there is no school on

Thursday, the exchange time shall be 6pm. If there is no school on Monday, the exchange time shall be at 9am.

Mother shall remain in compliance with any recommendations from the psychological evaluation and any other professionals that are involved with her as a result of the psychological evaluation. Mother shall sign releases to allow all professionals to provide status updates at least once a month to the father directly; said status updates shall include any additional/updated recommendations. If mother fails to remain in compliance or fails to sign the necessary releases, and/or if father does not receive status updates directly from the professionals, then her time shall revert back to PHASE ONE immediately.

. . . .

16.2 The Mother claims she has serious physical health problems, and has been diagnosed with [Ehlers Danlos Syndrome]. The mother claimed, for purposes of receiving financial benefits from various government agencies, that she was so physically disabled by her physical medical conditions that she was completely unable to go through a day at home to care for her children, that she passed out daily, and that she could not do any type of even light housework or be around any type of loud noise. In testimony mother claimed to be at risk of death from "internal decapitation". The way the mother testified about her alleged medical conditions in order to receive financial benefits from the veteran's administration would lead a finder of fact to think she was completely disabled from being able to physically or emotionally run a household or care for her children, let alone be employed outside the home. She also testified that it was her husband-the father in this case-that "did most of the cleaning, general house stuff and helping with kids when she cannot get out of bed". She testified that she claimed, in order to be found disabled and to receive benefits that she could not: lift, squat, bend, stand, reach, walk, kneel, talk, or complete tasks and have any concentration. However oddly, the mother's testimony and the testimony of her witnesses changed, and, once again under oath, the mother and her witnesses testified that during the same time periods that she had just alleged to be completely physically disabled, the mother drove a

23

truck with furniture and boxes across the country without the assistance of the father, unpacked and moved furniture items, went shopping for household goods, and bought, transported and built furniture from stores like IKEA.

. . . .

16.5    The mother claimed that the father and paternal grandmother "forced" their daughter "to take naps almost all day by swaddling her like a burrito", and she testified that she then ended up making pancakes and having pancakes with her daughter.  The Court finds this completely incredible, as a child is either young enough to be "swaddled like a burrito" or old enough to be able to chew pancakes, but not both.  This is an example of how quickly and incredibly the totally opposing alleged facts came in mother's testimony.

16.6    The Court finds that the mother's lack of credibility, her obvious lies under oath, as well as the implied falsehoods corroborate other testimony and evidence which established, by *clear and convincing evidence* to this Court that the mother's manipulative behavior is an almost pathological abusive use of conflict.

. . . .

16.9    Mother claims the father cannot adequately care for the children, for example: Mother alleges that Father feeds them gluten causing them to have constipation. Mother falsely informs various doctors that Father feeds the girls excessive gluten causing the girls to suffer from constipation.  Yet Father and his witnesses testified that the girls do not have such symptoms, and this Court finds the Father and his witnesses credible on this as well as other issues.  Despite the girls not having such symptoms, Father abided by what Mother demanded yet she continued to make such allegations to doctors and to Father's attorney (via numerous emails from Mother's attorney).   Yet Mother's witnesses testified that she herself feeds them gluten, to include her own brother, who testified that they routinely ate pizza with him when they all visited.

24

16.10 Mother frequently takes the children to doctors unnecessarily and provides the doctors with false or exaggerated history of her and her family's health conditions. The mother exaggerates the children's symptoms when in her care, whereas the father and his mother testified that when in father's custody the children are healthy and do not display most of the symptoms alleged by mother. The children, as a result of these appointments and what mother claims, believe they have long term health ailments that cause them to have anxiety.

16.11 Mother alleges that Father fails to take care of the girls' health because he questions the girls' medical providers about whether the girls have diagnosis as Mother claims. However, testimony showed that the mother artificially creates what she calls a "family medical history" by telling medical providers of diagnoses she claims various family members have— a third kidney, for example. There were conflicts about such family history in testimony, and the Court finds that the mother is not credible, and therefore her reporting to the children's medical providers is not credible. This is corroborated by the mother's inconsistency in reporting her own alleged medical conditions in different ways depending on what she is trying to accomplish—If she is trying to obtain benefits, she claims to be incredibly physically disabled, and if she is trying to establish her ability to physically and emotionally care for her children alone, she claims to not be affected at all.

. . . .

16.13 Mother alleged that Father does not protect the girls from Covid by exposing them to unmasked or unquarantined third parties. Mother refused to allow Father a visit on Christmas Eve 2020 when Father's family was in town, falsely claiming that there was an order from the governor prohibiting third party gatherings. Fully contradicting her testimony were mother's own witnesses who testified that she frequently exposed the children to unmasked and unquarantined third parties, including her own brother who was an essential grocery worker at the height of the pandemic, and who testified mother did not require

25

he wear a mask or be tested before allowing contact with the children.

. . . .

16.19 Mother is attempting to alienate the children from having a relationship with the father. The Guardian ad litem credibly testified that Mother was trying to erase Father from the girls' lives. Mother intentionally misrepresented facts regarding the Father in her Petition for Domestic Violence, falsely claiming that Father attempted suicide 100 times, that she feared he would rape the children and that he had threatened to kill her. This was done purposefully to gain advantage in the dissolution, and to create self-serving court documents to further handicap the father from having a healthy relationship with his children while the case was pending trial. The Court finds the mother intended and continues to attempt to sow distrust and fear in the children in relation to their father and his side of the family. This behavior causes real damage to the relationship the children can have with their own father, and is abusive not only to the father, but to the children.

(Boldface omitted.)

We accept the following unchallenged or insufficiently challenged findings of fact as true:

16.4 The mother admitted when examined by opposing counsel that she had been diagnosed with oppositional defiant disorder, intermittent explosive disorder, and had been prescribed psychotropic medication by a psychiatrist in the past.

. . . .

16.8 Mother's failure to effectuate the transfer of the children from her to the father at the start of his custodial time. Mother feigns that she cannot force the children to leave with the father, yet her actions (as set forth on the video exhibits) encourage the children to be distraught and refuse to calmly transfer to Father. During at least two exchanges, Mother called the police when the children were present. Mother refused to

leave the exchange location on more than one occasion, after the children have been transferred to father's custody causing one of the children to be upset.

. . . .

16.12 The Court finds that the mother manipulates and uses the children's medical providers for her end-goals, attempting to create documentation in the form of medical narratives and medical records as proof that the children need benefits and that she needs benefits, and also as proof that the children's father is inadequate, abusive or neglectful. This is corroborated by the mother's testimony that she provided her own sister's medical records to the genetic counselor for purposes of diagnosing her children with a disease, and then testifying that she "shredded the documents" and therefore no longer has them—while also separately testifying she had those records in digital form, thus making it impossible to destroy by "shredding." This Court finds this behavior endangers the children's physical, psychological and emotional well-being, and it is essential that the Court not permit it to continue.

. . . .

16.17 On June 25, 2020, Mother intentionally provided the health care providers a copy of the Temporary Domestic Violence Protection Order entered against the Father when she knew that it had been dismissed on June 18, 2020. Mother intentionally failed to provide the medical providers updated orders that expanded Father's residential time. Mother continued to allege to the girls' medical providers that Father was abusive. This Court finds this is another way for the mother to manipulatively attempt to create "records" that others may view as reliable and accurate because they were technically medical records.

16.18 Mother continued to allege that Father was not adequately assisting the children with their homework. Mother sent numerous emails and texts to Father and his family that were meant to be harassing in nature, and were designed to elicit unnecessary stress, conflict

27

and inflate legal costs. At the time this was taking place, Mother refused to agree to an order stating that a parent would be responsible for completing the girls' assigned Friday homework on each parent's weekend. Mother insisted that father complete all assigned Friday homework despite most of the homework not being due until the following Monday. Mother's refusal required Father to file a motion for presentation and included language regarding the homework as there needed to be clarification this issue.

Rosford argues several findings related to the parenting time schedule "go against the great weight of the evidence" and in some cases "are against undisputed evidence offered at trial." Rosford appears to argue the trial court erred by ordering that the children live with Walsh and have no contact with Rosford except for limited supervised visits and by finding supervised visitation was necessary until a complete psychological evaluation is performed.

Rosford presented witnesses who, based on information they had received from Rosford, testified it was not necessary to restrict her parenting. Rosford points to testimony of the GAL and two "doctors" noting there was no need to restrict her time with the children. One such statement was a letter from a physician stating her "physical and psychological disabilities should not prevent her from taking care of her children." This physician did not testify. The other was a letter by a mental health counselor supporting Rosford's parenting. Rosford's counselor stated on cross-examination she had reviewed only "maybe 22, 25" pages of Rosford's VA records. The counselor based her treatment only on what Rosford told her. But there was other evidence supporting that restrictions were necessary, including the GAL's testimony and Rosford's own conflicting testimony at trial raising concerns that she was not accurately reporting facts relevant to

28

parenting and the children's medical care. The trial court was not obligated to believe Rosford's evidence as opposed to other evidence supporting a contrary conclusion.

Substantial evidence supports the trial court's finding that Rosford was abusive toward the children with respect to medical care. For instance, Rosford claimed she saw blood in A.W.'s urine and was critical of Walsh for not communicating his plans to seek medical care for A.W. because Rosford wanted to go with them. One later visit did show that A.W. had blood in her urine. But the first visit that Rosford represented as addressing this problem reflected only Rosford's report that this occurred with no medical findings that it had. Rosford also testified there was a medical recommendation for the children to have certain dietary restrictions. The associated medical record did not support this testimony. In response to reported history of constipation, "plenty of fiber through fruits, vegetables and whole grains" was recommended. No gluten restriction was imposed but the record stated only that based on Rosford's reporting the children fared better on a low gluten diet "I think it is okay to continue this." Rosford had the children see geneticists about possible hypermobile Ehlers Danlos Syndrome diagnoses. She became angry when Walsh attempted to provide additional history from her family bearing on the diagnosis.

Other trial evidence supported the trial court's findings, but the issue was summarized in Walsh's testimony:

> Q. Why are you concerned about Isabella's statements about the girls' health?

29

A.     Because she's giving them a complex. I mean, she's making them scared. She's forcing them to police their diet when they're in my care. She's using that as a tool to control what I do at my house. She is keeping the girls away from social activities, social activities such as eating cupcakes at a party. She is taking away stuff that they really like, like just these very basic foods like nuggets and macaroni and cheese. She's completely misleading them about what doctors have told them. She is—I mean, she's lying to them about things the doctors have said to them, about them, and it's very clear that she doesn't really care what the doctor says. She just wants—as long as—if it doesn't follow her preconceived notions, they are not going to follow their advice.

     She's done this multiple times, and it is very difficult to co-parent when there's one person on one side, me, following the doctor's orders as closely as I can and then somebody else on the other side is telling the girls that I'm wrong, that I am misreading what the doctors have said even though it was two sentences of advice, that I am lying to them about what the doctors have said and that they really shouldn't—they shouldn't trust me at all.

     So there are a lot of reasons why this is a very big issue. I think, most importantly—this is what I discussed with their therapist—it's giving [E.W.] unnecessary anxiety, that it's tough to mitigate when I have their mother in their ear just saying, yeah, you're right to have these anxieties and you really shouldn't trust your dad because he doesn't know what the doctors say.

This is substantial evidence, which the trial court was entitled to believe, that Rosford was subjecting the children to excessive medical treatment.

Rosford argues the trial court erred in finding she misrepresented her medical conditions. In her written closing argument, Rosford represented herself as the children's primary caregiver and sought a parenting plan that would continue her in that role. Despite the physical capabilities that would be necessary for Rosford to have had that role and continue it, she admitted statements on cross-examination inconsistent with having those capabilities. Rosford made statements in disability applications such as "I haven't been driving or able to do any household

tasks that require a lot of movement." And, "I cannot even drive or hug my children without my common joints dislocating. It's painful and dangerous in certain situations. My fainting got worse, too, as I now faint almost daily." Rosford had reported because of her conditions her "husband does most cleaning, general house stuff, also helps me with the kids if I cannot get out of bed." The trial court's findings were supported by substantial evidence where Rosford reported conflicting levels of physical capability in her disability applications compared to her portrayal of her parenting abilities at trial.

Rosford argues there is no evidence disputing her family medical history of the presence of three kidneys. Before trial, Walsh filed a declaration by Rosford's mother indicating "Benjamin" "has a third kidney" as does one of Rosford's sisters. Rosford seems to rely on her mother's pretrial declaration to prove Rosford's family medical history of the presence of three kidneys and Walsh's knowledge of that history. Those statements are hearsay, and no hearsay exception applies to this statement. See Portmann v. Herard, 2 Wn. App. 2d 452, 464, 409 P.3d 1199 (2018) (noting a statement in a declaration was hearsay if the party offered it to prove the truth of the matter the declarant asserted); ER 801(c). Rosford's mother did not testify at trial, and Rosford submitted no admissible evidence at trial of any family history of extra kidneys. Rosford also claims the trial court improperly disbelieved Rosford had Ehlers Danlos Syndrome. But as noted above, separate from any diagnosis, there was conflicting evidence concerning Rosford's true physical capacities. The trial court was not required to accept Rosford's testimony on any issue merely because Walsh did not specifically rebut it.

Rosford argues the trial court erred by disbelieving A.W.'s constipation and urinary symptoms. Walsh told health care professionals and testified he had not witnessed such symptoms while the child was in his care. There is no evidence that his statements were not accurate. There is medical record evidence where A.W. presented with blood in her urine, but there are other chart notes where providers were unable to verify that any issues needing any medical care on this issue were present. While these visits note imaging showing a thickened bladder wall, they did not recommend any treatment for that condition. Rosford put on no evidence that Walsh denied constipation or urinary symptoms that he had witnessed, and Rosford's only evidence that he denied symptoms at all was her own testimony, which the trial court did not find credible.

Rosford argues the trial court misunderstood parenting techniques such as swaddling. The trial court based its credibility determination on a statement by Rosford that the children had been improperly swaddled by Walsh's relatives and later the same morning she made them pancakes for breakfast. Rosford did not put on evidence that the children were routinely swaddled even after they had reached an age at which they could eat solid foods such as pancakes. This appears to be another instance in which Rosford is attempting to put on more evidence in an effort to explain why a contradiction in her testimony should not be viewed as a contradiction. Rosford ignores that the trial court is entitled to make a credibility assessment based on the evidence admitted at trial, and further that the court is reviewing the totality of Rosford's testimony, not merely a series of statements unconnected to one another. The import of this finding is that the court

did not believe Rosford's account of the split of parenting responsibilities at this time in the parties' marriage, where Rosford was implying that Walsh had almost no participation in caring for the children.

Rosford argues the trial court erred by finding she violated COVID-19 protocols, because Rosford's visitors would meet in her outdoor kitchen area. Rosford's witnesses did not specify that they visited only in her semi-enclosed outdoor kitchen. The trial court could plausibly interpret their testimony as implying they visited indoors without masks. The trial court was not required to accept Rosford's later insistence they met only in the "outdoor kitchen" with "open walls." Further, the context was Rosford's unreasonably strict interpretation of COVID-19 requirements for Walsh's family as a means to justify her own resistance to visitation in compliance with the court's order. Even if Rosford's version of the facts were entirely true, which the court plainly did not accept, the court would still be entitled to conclude she was unreasonably interfering with Walsh's visitation by strictly construing his sister's quarantine obligations on the one hand, but liberally interpreting her right to have nonhousehold guests in a semi-enclosed area on the other. The point of the court's finding was that Rosford seized on the issue as a means of controlling Walsh's visitation rights.

Rosford argues the trial court noted her childhood mental health diagnosis, but ignored evidence this was a misdiagnosis. Rosford cites an April 10, 2013 Air Force memorandum clearing Rosford notwithstanding past mental health diagnoses, in which based on Rosford's report the reviewer acknowledges a possible connection between her childhood outbursts and diagnosis and abuse by

her stepfather. The report does not say, as Rosford asserts, that any childhood diagnoses were misdiagnoses.

In conjunction with the unchallenged findings taken as true, the findings Rosford challenges on this issue are supported by substantial evidence. The findings in turn support that there was no abuse of discretion in the trial court's phased approach to residential time dependent on Rosford receiving appropriate mental health treatment. See In re Marriage of Chandola, 180 Wn.2d 632, 648, 327 P.3d 644 (2014) (a trial court abuses its discretion if it imposes a restriction that is not reasonably calculated to prevent the child from physical, mental, or emotional harm).

VI

In her opening brief, Rosford claimed the trial court "erred in its findings related to discovery issues," but simply offers explanations for her various discovery actions and lists grievances with Walsh's discovery practices without ever identifying an alleged erroneous discovery ruling. Rosford failed to provide any reasoned argument or citations to authorities to support this assignment of error, so we decline to consider it. "Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration." Holland v. City of Tacoma, 90 Wn. App. 533, 538, 954 P.2d 290 (1998). We may decline to consider conclusory arguments unsupported by citation to authority. Brownfield v. City of Yakima, 178 Wn. App. 850, 876, 316 P.3d 520 (2014); West v. Thurston County, 168 Wn. App. 162, 187, 275 P.3d 1200 (2012).

Rosford argues the trial court erred by allowing Walsh to contest issues at trial that he had admitted to in discovery. This argument appears to be based on Walsh's questioning at trial whether Rosford truly has hypermobile Ehlers Danlos Syndrome. She claims she would have been prepared to present expert testimony if she had known this would be questioned. Rosford's argument fails for two reasons. First, Walsh never admitted she had hypermobile Ehlers Danlos Syndrome. Second, he had a reasonable basis to question any previous statement at the time of trial.

For Walsh's alleged prior admission, Rosford points to discovery responses, declarations filed in court, and Walsh's statements to the police reflected in exhibit 357. We discussed Walsh's statements to the police above, and Walsh's trial testimony was that he believed Rosford had hypermobile Ehlers Danlos Syndrome only because she had said so. Walsh's interrogatory answers were admitted as exhibit 419. Rosford never points to it, but Walsh referred to her having Ehlers Danlos Syndrome at least on page 55 in his response to her request for production number 69. Rosford does not specify any declaration in which this was allegedly admitted. However, none of these are binding discovery admissions that would prevent a party from testifying differently at trial, subject to impeachment. All of the statements are attributable to the time before April 2022 when Walsh first received Rosford's medical records, which provided new grounds to question whether she had hypermobile Ehlers Danlos Syndrome. The trial court made no error in refusing Rosford's trial objection to Walsh bringing out reasons to question her claimed diagnoses.

35

VII

Rosford challenges several findings of fact related to the division of the parties' assets and the designation of assets and debts. We consider the following findings of fact on this issue from the findings and conclusions about a marriage to be properly challenged:

> 5.    Separation Date
>
> The marital community ended on May 8, 2020. The parties stopped acquiring community property and incurring community debt on this date.
>
> . . . .
>
> 9.    Community Personal Property (possessions, assets, or business interests of any kind)
>
> . . . .
>
> 1. Community $14,500.77 funds
>
> . . .
>
> 11.    Community Debt
>
> The spouses' community debt is listed below:
>
> Solar Panel Debt $19,126.37 (at separation)
> Chris Best Buy credit card $5,971.15
> Chris Chase credit card $4,380.59

(Boldface omitted.) Rosford also challenges the equalization payment the trial court ordered her to pay Walsh in the Dissolution Decree: "$12,716.59 which is the equalization payment from wife to husband, payable from wife's attorney trust account."

Rosford argues the parties separated by March 2020, pointing to some evidence that could have supported such a finding. The trial court found they separated May 8, 2020. This is supported by substantial evidence, specifically, Rosford's testimony that May 22, 2020 was "two weeks" after they separated.

Rosford argues based on exhibit 304 that she removed only $13,996.77 from the USAA Federal Savings Bank savings account, not $14,500.77 as found by the trial court. On May 4, 2020, Rosford transferred $13,996.77 from the parties' joint savings account to herself.

Exhibit 304 includes a statement from the parties' joint USAA savings account for the period April 30, 2020 through May 31, 2020. It shows a balance from the last statement of $14,500.77, and two debits during the statement period. Both debits were on May 4, 2020. One was an automatic teller machine (ATM) withdrawal of $504.00, and the second was a funds transfer to Rosford of $13,996.77, leaving a balance of ".00." The statement shows a deposit on May 29, 2020, of $4.00 plus interest of $0.12, leaving an ending balance for that period of $4.12. Walsh testified that "at some point I went to an ATM to withdraw some money" from the joint USAA savings account and "did not have any money in my account." This is substantial evidence that Rosford drew down the account to a zero balance through the combination of the $504.00 ATM withdrawal and the $13,996.77 funds transfer, amounting to an appropriation of $14,500.77.

Rosford also argues that these funds or a portion of them were awarded to her in temporary orders in June 2020. Rosford does not provide a citation to the clerk's papers where such an order can be found. We have noted in our record a

temporary parenting plan entered June 18, 2020, and an order appointing guardian ad litem for a child entered June 18, 2020, but Rosford fails to establish a temporary order influencing the trial court's ultimate determination about the characterization of the funds Rosford removed from the joint savings account. Rosford also argues it was undisputed these funds in savings had been earmarked to pay the community mortgage debt. But Walsh gave testimony that the trial court was entitled to believe that it was unnecessary for Rosford to make substantial payments toward the mortgage when she did, and that they would have been entitled to additional forbearance when Rosford made the payments. Rosford does not show error in the trial court's treatment of her unilateral withdrawals from the USAA joint savings account.

Rosford argues the trial court erred in finding the parties' community debt for installing solar panels on their former residence in Texas was $19,126.37, contending the proper figure was $19,907.03. However, Rosford appears to misread the statements admitted into evidence documenting this debt. Rosford testified that page 909 of exhibit 394 was a statement for the solar debt for May 22, 2020. That page showed a "beginning balance" for the statement period of $19,907.03. However, according to that statement, May 22, 2020 was the due date for the next payment. Page 907 of the same exhibit showed a new balance of $19,126.37 after crediting a payment on April 30, 2020. Based on the trial court's supported finding that the parties separated on May 8, 2020, the court appropriately valued this community debt based on the new balance of $19,126.37

after the last payment before the parties separated. The valuation is supported by substantial evidence.

Rosford argues it was error to treat Walsh's credit card debt as community property because Walsh listed both credit cards as separate debt in his interrogatory responses and offered no testimony at trial to contradict this. The trial court's characterization of property as community or separate is a legal question subject to de novo review. In re Marriage of Mueller, 140 Wn. App. 498, 503-04, 167 P.3d 568 (2007). Although property is characterized as of the date of its acquisition, the date alone is not dispositive. See In re Marriage of Sedlock, 69 Wn. App. 484, 506, 849 P.2d 1243 (1993). The test for determining a property's character is " 'whether it was acquired by community funds and community credit, or separate funds and the issues and profits thereof.' " Id. at 506 (internal quotation marks omitted) (quoting Katterhagen v. Meister, 75 Wash. 112, 115, 134 P. 673 (1913)). Dissipation of community assets is one of the factors that the trial court may consider in creating a just and equitable distribution of property. In re Marriage of Williams, 84 Wn. App. 263, 270, 927 P.2d 679 (1996).

Walsh testified he incurred credit card debt to meet living expenses. In conjunction with Rosford's withdrawal of funds from the parties' USAA savings account on May 4, 2020 before separation, the trial court had substantial evidence to find that Walsh incurred this debt because of Rosford's unilateral appropriation of community assets and therefore it was appropriately characterized as community debt. In addition, Rosford fails to show that the trial court's allocation

of this debt, given these facts, was an abuse of discretion regardless of its characterization as community or separate.

With respect to the trial court's property division, Rosford challenges the court's equalization payment. She argues it was not supported by substantial evidence and alternatively that it should be adjusted based on the valuations she proposes for the assets and debts discussed above. But because the trial court's disposition of the above assets and debts is supported by substantial evidence, the trial court's equalization payment is also supported by substantial evidence.

VIII

Rosford challenges the findings of fact related to the award of $35,000.00 in attorney fees to Walsh.

We consider the following findings of fact from the findings and conclusions about a marriage order to be properly challenged:

14.    Lawyer Fees and Costs

. . . .

> Other findings: The Petitioner incurred fees and costs in excess of $140,000, of which a significant amount was incurred as a result of the Respondent's intransigence and conduct. The Court has evaluated the credibility of testimony of both parties, and, for reasons further explained in Paragraph 16 of the Final Parenting Plan Findings of Fact, gives little weight to much of Respondent's testimony. The Court also evaluated certain trial conduct by Counsel, and as further explained in Supplemental Findings of Fact, finds that conduct by Respondent's Counsel unreasonably inflated the costs of this litigation.

> On two separate occasions, the Court ordered that Husband's request for attorney fees was reserved for trial: 1) On September 8, 2020 when Husband had to file the motion to

40

appoint his mother as lay supervisor and he requested $2,000 and 2) on November 3, 2021 for Wife's retaliatory filing of motions (motion to remove GAL and motion to compel) and Husband requested $9,084 in fees.

The Wife failed to provide relevant discovery timely and failed to adequately answer. For example, wife failed to timely submit the 2,400 plus pages of her VA medical records which were not provided to Husband until April 26, 2022. Wife had these records prior to her submission to Husband, as she utilized these for her Mormon Church lawsuit settled in October 2021. During her testimony in trial the wife claimed that she "shredded" these records, and at other times she admitted that she received them and possessed them in digital format. Another example is when wife objected to providing documents based on attorney-client privilege but failed to comply with the obligation to submit a privilege log.

The Wife made numerous demands for discovery from Husband despite him being substantially compliant, which the Court found. Wife's complaints were frivolous and improper when Wife alleged that Husband had some hidden financial accounts despite it being documented he had limited income and no money and when wife disputed his narrative answers. Despite the frivolous complaints, Husband spent hours and incurred substantial fees answering Wife's demands.

In addition, the number of days for trial were excessive caused primarily by the length of time it took for Wife's direct testimony and the length of time it took for Wife to cross examine the Guardian ad litem. The number of days for trial was also unreasonably excessive due to Respondent's counsel calling a number of witnesses who had either no relevant testimony to the issues before the Court, or, as was the case with Meera Shin, that testimony was clearly biased, uneducated, and unprofessional—though, as aptly noted by the witness herself not technically "illegal".

(Boldface omitted.)

Rosford contends, "Awarding attorney's fees to the Petitioner goes against the great weight of the evidence in relation to the course of conduct in this case."

41

Walsh argues the record supports the trial court's finding of Rosford's intransigence, which in turn supports the court's fee award.

Under RCW 26.09.140, courts wield discretion to award attorney fees and expenses in marriage dissolution proceedings both at trial and on appeal. Buchanan, 150 Wn. App. at 739. " 'An award of attorney's fees rests with the sound discretion of the trial court, which must balance the needs of the spouse requesting them with the ability of the other spouse to pay.' " Id. (quoting Kruger v. Kruger, 37 Wn. App. 329, 333, 679 P.2d 961 (1984)). An important consideration, apart from the relative abilities of the two spouses to pay, is the extent to which one spouse's intransigence caused the spouse seeking the award to require legal services. Id. Intransigence includes " 'making the trial unduly difficult and costly by one's actions,' and causing the other party to 'incur unnecessary and significant attorney fees.' " In re Marriage of Bresnahan, 21 Wn. App. 2d 385, 411, 505 P.3d 1218 (2022) (citations omitted) (quoting Bobbitt, 135 Wn. App. at 30; In re Marriage of Burrill, 113 Wn. App. 863, 873, 56 P.3d 993 (2002)). When intransigence causes the party seeking attorney fees " 'to require additional legal services,' the parties' relative financial resources are irrelevant." Id. (quoting In re Marriage of Foley, 84 Wn. App. 839, 846, 930 P.2d 929 (1997)). The attorney fee award should segregate the fees incurred because of intransigence, unless the spouse's " 'bad acts permeated the entire proceeding.' " Id. (quoting In re Marriage of Sievers, 78 Wn. App. 287, 311, 897 P.2d 388 (1995)).

The trial court must indicate on the record the method it used to calculate the attorney fee award. Foley, 84 Wn. App.at 846. In determining fees a court

should consider (1) the factual and legal questions at issue, (2) the amount of time spent preparing the case, and (3) the value of the property involved.  Id. at 846-47.  The lodestar formula is not required to calculate attorney fees in a dissolution action.  In re Marriage of Van Camp, 82 Wn. App. 339, 340, 918 P.2d 509 (1996).

Rosford argues her cross-examination of Dr. Schau took "so long largely due to Dr. Schau's refusal to acknowledge what parts of his electronic file he had produced and what he hadn't."  As discussed above, Rosford highlighted many e-mail communications during her five and a half hour cross-examination of Dr. Schau.  The trial court appropriately concluded that this time was wasted, because Rosford never demonstrated any withheld e-mail communications were particularly germane to any of his opinions or decisions before the trial court.

Rosford attempts to justify her lengthy testimony by suggesting it "took time to go over all evidence to demonstrate that the allegations made by Chris were not true."  What Rosford sought to disprove largely had little relevance to the trial court's ultimate determination to fashion a final parenting plan, child support order, dissolution decree, and findings and conclusions about the parties' marriage.  The trial court appropriately concluded that this use of time was also wasteful.

Rosford argues the trial court failed to indicate on the record what method was used to calculate fees.  Walsh submitted a financial declaration before trial, on April 29, 2022, that stated the total attorney fees and costs he incurred as of that date amounted to $96,859.71.  He represented in his written closing argument he had by then incurred "close to $140,000" in attorney fees.  In his written argument, Walsh argued that several pretrial motions, several discovery issues,

and several trial disputes showed intransigence that supported shifting $35,000 in fees. The trial court granted Walsh's attorney fees request for having to respond to Rosford's motion for reconsideration. The trial court entered the following findings on the record in support of its ruling:

> The Court finds the amount of time the Court spent reviewing all the materials and in estimating based on previous evidence having been submitted by both sides about attorney's fees as well as being familiar with the litigation history in this case and the findings of abusive use of litigation and conflict that this amount is reasonable and appropriate, that the father has need for it, and the mother has the ability to pay.

In addition to specific pretrial motions on which fees had been reserved, the trial court's final orders reflect that the testimony of Rosford and her cross-examination of Dr. Schau were excessive. Together, this supports the award of $35,000.00 in attorney fees to Walsh as the portion of his attorney fees reasonably attributable to Rosford's intransigence. The trial court reasonably relied on Rosford's intransigence when calculating the fee award and, under Bresnahan, was not required to segregate fees based on intransigence from fees based on other grounds, because the trial court found Rosford's intransigence permeated much of the proceedings.

Rosford argues she does not have the ability to pay a $35,000.00 attorney fee award and the trial court ignored the fact that the court awarded almost all of the parties' community assets to Walsh. Under Bresnahan, the parties' relative financial resources are irrelevant because of Rosford's intransigence.

Substantial evidence supports the trial court's findings of fact, and Rosford demonstrates no abuse of discretion in the fee award entered against her.

IX

Rosford argues the trial court failed to grant her motion for a new trial under CR 59(a)(1), (2), (5), (7)-(9). We review a trial court's decision on a motion for a new trial for abuse of discretion. Henderson v. Thompson, 200 Wn.2d 417, 430, 518 P.3d 1011 (2022), cert. denied, 143 S. Ct. 2412 (2023). To the extent Rosford relies on arguments she made as to other issues, those have been addressed above.

CR 59(a)(1) permits a new trial when irregularities in the proceedings of the court prevent the moving party from having a fair trial. Rosford argues the trial court judge committed irregularities in the trial by shopping online and doing other activities during testimony and imposing different rules for each party.

After the trial court entered its final orders, Rosford moved for reconsideration. Rosford filed a declaration claiming she saw the trial court judge shop online, use a texting or messaging application, and write and send personal and work-related e-mails, and browse a social media website during testimony. Walsh challenged these accusations, claiming Rosford either could not or did not see what was on the trial court's computer screen. We have thoroughly reviewed the entirety of the 13½ days of trial testimony. It shows the trial court was immediately responsive to the issues as they arose, including issues in the trial testimony, the objections of counsel, the behavior of the parties and witnesses, and the thousands of pages of exhibits the parties presented and whose admissibility they repeatedly argued. This was followed by detailed findings. The transcript and the subsequent detailed written orders show the trial court judge

was paying exacting attention to the evidence. We do not revisit the trial court's discrediting Rosford's posttrial declaration.

Nor does Rosford show error in the trial court's management of the examination of witnesses at trial. The trial court allowed Rosford days' worth of time to present her evidence and cross-examine witnesses over the 13½ days of testimony. That the trial court eventually was forced to place reasonable limitations on the continued examination of witnesses establishes no error. " 'Courts may, within their sound discretion, deny cross-examination if the evidence sought is vague, argumentative, or speculative.' " Farah v. Hertz Transporting, Inc., 196 Wn. App. 171, 187, 383 P.3d 552 (2016) (quoting State v. Darden, 145 Wn.2d 612, 620-21, 41 P.3d 1189 (2002)). Finally, Rosford does not specifically identify the separate rules the trial court allegedly imposed on Rosford and Walsh. We therefore decline to consider that argument.

CR 59(a)(2) permits a new trial due to misconduct of the prevailing party. To the extent Rosford makes the same arguments as to Walsh's alleged misconduct during the proceedings below, those have been addressed above.

CR 59(a)(5) permits a new trial where damages are so excessive as unmistakably to indicate that the verdict must have been the result of passion or prejudice. Because this trial did not involve a money damages remedy and Rosford does not identify what damages she characterizes as excessive, we decline to consider this ground.

CR 59(a)(7) permits a new trial if there "is no evidence or reasonable inference from the evidence to justify the verdict or the decision, or that it is contrary

to law." As we discussed above, substantial evidence supports the trial court's findings. Rosford's arguments for a new trial on this ground are meritless.

CR 59(a)(8) permits a new trial when an "[e]rror in law occurring at the trial and objected to at the time by the party" moving for a new trial. Rosford offers no argument or citation to authorities or the record in support of this ground, so we decline to consider it.

CR 59(a)(9) permits a new trial when substantial justice has not been done. A court may grant a motion for a new trial when important rights of the moving party are materially affected because substantial justice has not been done. Ramey v. Knorr, 130 Wn. App. 672, 686, 124 P.3d 314 (2005). Rosford fails to prove her rights were materially affected because of any irregularity at trial.

The trial court did not abuse its discretion by denying Rosford's motion for a new trial under CR 59.

X

Walsh argues he should be awarded attorney fees as sanctions under RAP 18.9(a), because Rosford's brief failed to prove any entitlement to relief, Rosford failed to follow the RAPs, and her brief is disorganized. Walsh claims Rosford's appeal is frivolous and devoid of merit with no possibility of reversal. We decline to award attorney fees.

Under RAP 18.9(a), a party is subject to sanctions for filing a frivolous appeal or failing to comply with the rules of appellate procedure. " 'Appropriate sanctions may include, as compensatory damages, an award of attorney fees and costs to the opposing party.' " Kinney v. Cook, 150 Wn. App. 187, 195, 208 P.3d

1 (2009) (quoting <u>Yurtis v. Phipps</u>, 143 Wn. App. 680, 696, 181 P.3d 849 (2008)). An appeal is frivolous if there are no debatable issues on which reasonable minds might differ and it is so totally devoid of merit that there is no reasonable possibility of reversal. <u>In re Marriage of Schnurman</u>, 178 Wn. App. 634, 644, 316 P.3d 514 (2013). An appeal that is affirmed simply because the arguments are rejected is not frivolous. <u>Id.</u> In determining whether an appeal is frivolous, we consider the record as a whole and resolve all doubt in favor of the appellant. <u>Skinner v. Holgate</u>, 141 Wn. App. 840, 858, 173 P.3d 300 (2007).

Rosford's appeal is not frivolous. The trial court's final residential schedule imposes very strict requirements on Rosford, despite the GAL's recommendation that originally proposed more equal parenting terms. Rosford's challenges of the trial court's findings on Rosford's motion to remove the GAL, parenting plan, domestic abuse, and assets are not frivolous even though substantial evidence exists to support those findings.

Affirmed.

_Birk, J._

WE CONCUR:

_Feldman, J._     _Chung, J._